[No. B133284. Second Dist., Div. Four. Dec. 5, 2000.]

MARGARET GARDENHIRE, Plaintiff and Respondent, v.
HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, Defendant
and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, and IV.

## COUNSEL

Lewis, D'Amato, Brisbois & Bisgaard, Alan R. Zuckerman, John L. Barber and Jessica A. Fortner for Defendant and Appellant.

Law Offices of Lenton Aikins & Associates, Lenton Aikins; Esner & Chang and Stuart B. Esner for Plaintiff and Respondent.

## OPINION

**CURRY, J.**—Respondent Margaret Gardenhire prevailed in a claim against her employer, appellant Housing Authority of the City of Los Angeles (the Housing Authority), in a claim for retaliation under Labor Code section 1102.5,[1] the so-called whistleblower statute. She recovered damages in the amount of $1,318,785.10. On appeal, the Housing Authority contends that Gardenhire failed to establish entitlement to recovery under the statute because she did not report her suspicion of illegal activity to an outside agency, because she was not subjected to adverse employment action, and because there was no evidence she reasonably believed she was reporting unlawful conduct. The Housing Authority further argues that emotional distress damages awarded were excessive. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The essential facts are not greatly disputed. Gardenhire began working for the Housing Authority in October 1990. Performance evaluations dated

---

[1]All statutory references are to the Labor Code unless otherwise indicated.

January 1992 and December 1992 were positive, rating her overall performance in her position as an eligibility interviewer "good." In 1992, Gardenhire, still working as an eligibility interviewer, was give a certificate "for outstanding accomplishments" in service to the Housing Authority. In the spring of 1993, Gardenhire received an "outstanding" performance rating.

In early 1994, Gardenhire was promoted to housing specialist. Later that year, she was promoted to relocation coordinator, making her responsible for coordinating temporary moves by the residents of apartments and residences under the control of the Housing Authority and placing her under the direct supervision of Lucille Loyce. As a result of the promotion, she was provided with a Housing Authority car.

In September 1994, Loyce recommended that the relocation coordinator position held by Gardenhire be given a higher salary, supporting the request in part by reference to Gardenhire's competence.

In June 1996, Loyce named Gardenhire employee of the year. Loyce discussed promoting Gardenhire to manager I in 1997, which would have involved an increase in pay.

In September 1996, Gardenhire brought to Loyce's attention problems she was having with Dwayne Williams, an individual who had obtained several consulting contracts with the Housing Authority. One contract held by Williams involved teaching the residents how to create and operate their own businesses. Another involved preoccupancy training and design under which Williams was to develop a program to involve residents in recognizing issues relating to maintenance, housekeeping, and related matters. In 1995, Williams, in conjunction with the Jordan Downs Resident Management Corporation (RMC), an organization which represents the people in the development, proposed a pilot program under which they would be the movers for certain Jordan Downs residents who were being temporarily relocated. If all went well, they would obtain a contract to perform a larger number of moves. According to Gardenhire, while the pilot program was ongoing in 1995, Williams sought delays in five or six of the 20 moves, which could have resulted in receipt of more compensation from the Housing Authority. Williams encouraged Gardenhire to cause delays in the moves or authorize moves on the weekends or holidays so that he could receive more compensation. Also, during the pilot program, Williams sought permission from Gardenhire to enter residences when the occupants were not home. In addition, he wanted her to sign off on bills for extermination of the vacant units before she had confirmed that exterminations had been done. At one point, Loyce asked Gardenhire to give Williams copies of bids from

other companies. Gardenhire did so, placing the bids in an envelope and placing the envelope on Williams's desk. Gardenhire also learned that Sheila Barnes, a clerk typist for the Housing Authority, retyped a proposal submitted by Williams on behalf of the RMC for fumigation work so that the bid was lower than other bids. At the meeting in September 1996, Gardenhire informed Loyce about Williams's requests for delay, his requests to enter units when the residents were not there, and his requests for premature extermination sign-offs. Loyce denied that any problems with Williams were raised at the September meeting.

In November 1996, there was a relocation staff meeting where Sandra Raye, formerly Gardenhire's subordinate, announced that she was going to be taking over all relocation responsibilities from Gardenhire. Loyce told Gardenhire that this change was being made because Raye worked well with the RMC. Loyce accused Gardenhire of being a roadblock preventing Black people from getting work.

In February 1997, while Gardenhire was on vacation, Loyce arranged for the locks on Gardenhire's office to be changed. Loyce intimated at that time that Gardenhire had been taking things out of the office without permission.

In March 1997, Loyce summoned respondent to her office for a meeting and accused her of failing to keep her files and office in order. Loyce yelled at Gardenhire and called her a liar. Loyce stated she was going to start documentation to have Gardenhire terminated. Loyce directed Gardenhire to return the Housing Authority car previously provided to her.

In May 1997, Loyce changed Gardenhire's time card to prevent payment for a period when Gardenhire was absent. This occurred because Gardenhire's doctor's written verification said the absence was due to "vacation," although he apparently meant that Gardenhire needed a vacation because of stress, not that she was on vacation. Later, the physician issued a certificate of injury diagnosing Gardenhire as suffering from stress. Loyce would not accept this documentation, and Gardenhire never received sick pay for this period.

In August 1997, Loyce prepared a performance evaluation for Gardenhire which was very unfavorable. It stated, among other things, that Gardenhire's office was filthy, that important notices were missing from relocated residents' files, that utility bills were going unpaid, and that Gardenhire was unavailable during periods when emergency relocations had to take place. As a result of this evaluation, Gardenhire was placed on a 90-day work improvement plan. At the end of the 90 days, Gardenhire received another

unsatisfactory evaluation from Loyce. Loyce admitted that she wanted to terminate Gardenhire and that, except for the lawsuit, Gardenhire might have been terminated, although Loyce herself did not have authority to do so.

In the meantime, in May 1997, Gardenhire drafted an outline of the improprieties she knew or suspected and presented it to the Housing Authority's commissioners. She repeated the allegations that Williams asked her to cause delays on moving jobs in order to create extra charges and tried to force her to illegally enter residents' homes during their absence. She stated that she had been instructed to give Williams copies of other bids before the RMC submitted its bid. She reported that Raye informed her she expected compensation from Williams if she (Raye) could coerce a movie company that happened to be shooting a film at Jordan Downs to pay $3,500 to move a resident, which the RMC had already contracted to do. According to the report, Raye showed Gardenhire a check for $800 she had previously received from Williams. Gardenhire charged that Williams had offered to invest in an outside business owned by Gardenhire.

In December 1997, Commissioner Kane showed Gardenhire's memorandum to Williams. The commissioners directed Donald Smith, the executive director, to investigate the allegations in the memorandum. Smith appointed Rena Hessman, the chief of staff and director of Intergovernmental Relations for the Housing Authority, and Ray Palacios, the public safety director for the Housing Authority, to conduct the investigation. They interviewed Gardenhire twice. The investigation went no further because Gardenhire failed to provide Hessman and Palacios with more specific information, documentation, or tangible evidence to support the charges.

Gardenhire filed suit in December 1997 for discrimination, retaliation, aiding and abetting, and harassment under the Fair Employment and Housing Act (Gov. Code, § 12940 et seq., FEHA); slander; and intentional infliction of emotional distress. Neither her original complaint nor her first amended complaint made any reference to section 1102.5. The aiding and abetting claim under FEHA was dismissed on summary adjudication prior to trial. At the end of trial, the court granted a motion by Gardenhire to amend her complaint to allege a section 1102.5 cause of action against appellant. The court granted nonsuit on all but that cause of action and the cause of action alleging intentional infliction of emotional distress.

The jury returned a verdict in favor of Gardenhire in the sum of $1.3 million for emotional distress damages and $125,000 for economic damages. The trial court granted a Housing Authority request for new trial, conditioned on Gardenhire's accepting a remittitur of the economic damages to

$18,785.10. Gardenhire accepted the reduction and judgment was entered in her favor. The Housing Authority appealed.

DISCUSSION

I

Section 1102.5, subdivision (a) provides: "No employer shall make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or violation or noncompliance with a state or federal regulation." Subdivision (b) provides: "No employer shall retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or violation or noncompliance with a state or federal regulation."

Section 1103 states that an employer who violates the chapter which contains section 1102.5 is guilty of a misdemeanor punishable by imprisonment or fine. Section 1105 provides: "Nothing in this chapter shall prevent the injured employee from recovering damages from his employer for injury suffered through a violation of this chapter." In *Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481 [171 P.2d 21, 166 A.L.R. 701], which involved section 1101, another provision in the same chapter that prevents employers from imposing prohibitions on employees engaging in political activity, the employer argued that the statute was penal in nature and did not create any civil right of action. The court disagreed: "The contract of employment must be held to have been made in the light of, and to have incorporated, the provisions of existing law. [Citations.] Hence, upon violation of the section, an employee has a right of action for damages for breach of his employment contract." (28 Cal.2d at p. 486.)

Section 1106, added in 1992 (Stats. 1992, ch. 1230, § 1, p. 5783), provides: "For purposes of Sections 1102.5, 1103, 1104, and 1105, 'employee' includes, but is not limited to, any individual employed by the state or any subdivision thereof, any county, city, city and county, including any charter city or county, and any school district, community college district, municipal or public corporation, political subdivision, or the University of California."

The Housing Authority contends that Gardenhire's claim must fail because she reported her suspected violation of law to her employer rather

than a separate government agency or a law enforcement agency. The Housing Authority relies on *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66 [78 Cal.Rptr.2d 16, 960 P.2d 1046]. In that case, the Supreme Court had before it the issue of whether an employee had stated a cause of action for termination in violation of public policy, where he reported to his employer, a manufacturer of fuselage and wing components for military and civilian aircraft, his suspicion that parts were being shipped despite having failed inspection. In discussing whether public policy embodied in regulations could form the basis of a wrongful termination cause of action, the Supreme Court described section 1102.5 as follows: "In 1984, our Legislature provided 'whistle-blower' protection in section 1102.5, subdivision (b), stating that an employer may not retaliate against an employee for disclosing a violation of state or federal regulation to a governmental or law enforcement agency. This provision reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation. *Section 1102.5, subdivision (b), concerns employees who report to public agencies. It does not protect plaintiff, who reported his suspicions directly to his employer.* Nonetheless, it does show the Legislature's interest in encouraging employees to report workplace activity that may violate important public policies that the Legislature has stated. The state's whistle-blower statute includes administrative regulations as a policy source for reporting an employer's wrongful acts and grants employees protection against retaliatory termination. Thus, our Legislature believes that fundamental public policies embodied in regulations are sufficiently important to justify encouraging employees to challenge employers who ignore those policies." (*Green v. Ralee Engineering Co., supra,* 19 Cal.4th at pp. 76-77, italics added.)

We do not agree that the italicized language resolves the issue before us favorably to appellant. Section 1102.5 clearly covers employees who report their concerns to public agencies. Gardenhire reported directly to the commissioners of a public agency which happened to also be her employer. The commissioners of the agency, themselves public employees and charged with the protection of the public interest, commenced an investigation. Gardenhire could not have expected there was any further need to report her suspicions to higher authorities.

This court decided a related issue in *Collier v. Superior Court* (1991) 228 Cal.App.3d 1117 [279 Cal.Rptr. 453]. The employee there had reported to his employer, a music production company, that a large number of records were being shipped for promotional purposes with no notation forbidding the recipient from selling them. The employee was concerned that the records would be illegally sold, depriving recording artists of royalty payments,

depriving the state and federal tax authorities of taxes due, and creating a competitive disadvantage among other sellers of the company's records. Discussing section 1102.5, subdivision (b), this court stated: "If public policy were strictly circumscribed by this statute to provide protection from retaliation only where employees report their reasonable suspicions directly to a public agency, a very practical interest in self preservation could deter employees from taking any action regarding reasonably founded suspicions of criminal conduct by coworkers. Under that circumstance, an employee who reports his or her suspicions to the employer would risk termination or other workplace retaliation. If this employee makes a report directly to a law enforcement agency, the employee would be protected from termination or other retaliation by the employer under Labor Code section 1102.5, but would face an obvious disruption of his or her relationship with the employer, who would be in the unfortunate position of responding to a public agency without first having had an opportunity to deal internally with the suspected problem. These discouraging options would leave the employee with only one truly safe course: do nothing at all." (*Collier v. Superior Court, supra,* 228 Cal.App.3d at pp. 1123-1124.)

By the same token, if we interpret section 1102.5 to require an employee to go to a different public agency or directly to a law enforcement agency before he or she can be assured of protection from retaliation, we would be encouraging public employees who suspected wrongdoing to do nothing at all. Under the scenario envisioned by the Housing Authority, if the employee reports his or her suspicions to the agency, as Gardenhire did here, he or she will have to suffer any retaliatory conduct with no legal recourse. If the employee reports suspicions to an outside agency or law enforcement personnel, he or she risks subjecting the agency to negative publicity and loss of public support which could ensue without regard to whether the charges prove to be true. At the same time, a serious rift in the employment relationship will have occurred because the employee did not go through official channels within the agency which was prepared to investigate the charges. We see no reason to interpret the statute to create such anomalous results.

II-IV*

. . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 236.

## DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied January 4, 2001, and appellant's petition for review by the Suprem Court was denied March 14, 2001.