[Nos. G043142, G043813. Fourth Dist., Div. Three. Nov. 8, 2011.]

GEORGE JARAMILLO, Plaintiff and Respondent, v.
COUNTY OF ORANGE, Defendant and Appellant.

**COUNSEL**

Lawrence Beach Allen & Choi, David D. Lawrence and Jin S. Choi for Defendant and Appellant.

Law Offices of Joel W. Baruch and Joel W. Baruch for Plaintiff and Respondent.

**OPINION**

**RYLAARSDAM, Acting P. J.**—The County of Orange (the County) appeals from a judgment awarding former Orange County Assistant Sheriff George Jaramillo (Jaramillo) backpay for the period from his March 2004 summary dismissal from the sheriff's department until his January 2007 plea of no contest to two state law felony counts. The 2007 no contest plea made it impossible for him to continue to work as a law enforcement officer in any event. (Gov. Code, § 1029; all further undesignated statutory references are to that code.) There is no dispute that the summary termination without notice, or the opportunity for an administrative appeal, violated the Public Safety Officers Procedural Bill of Rights Act (POBRA), section 3300 et seq. (See generally *Riverside Sheriffs' Assn. v. County of Riverside* (2011) 193 Cal.App.4th 20, 30 [122 Cal.Rptr.3d 197] (*Riverside Sheriffs*) [dismissals are considered punitive actions under POBRA and require opportunity for administrative appeal].) The County argues, however, that the trial court erred in not affording preclusive effect either to (a) Jaramillo's 2007 felony convictions or (b) certain waivers he signed in 1998 and again in 2000 waiving

POBRA protections. For reasons explained below, the County's arguments are unpersuasive. We affirm the judgment.

FACTS

1. *The Firing*

This appeal comes to us after a court trial giving judgment for respondent Jaramillo. Accordingly, we are required to resolve all evidentiary conflicts, draw all reasonable factual inferences, and uphold all express or implied findings in Jaramillo's favor, if supported by substantial evidence. (*People v. Alexander* (2010) 49 Cal.4th 846, 883 [113 Cal.Rptr.3d 190, 235 P.3d 873].)

Jaramillo worked for the Garden Grove Police Department for 14 years. He left the department in 1997. He met Mike Carona in 1996 at a political breakfast. The two became friends. Carona asked Jaramillo to become his campaign manager for Carona's upcoming run for county sheriff. Jaramillo agreed. Carona won the election. Carona appointed four or five "assistant" sheriffs to be right under him in the department hierarchy. One was Jaramillo. Another was Don Haidl.

In 2002, a videotape surfaced showing Haidl's son and two of the latter's friends gang-raping a comatose 16-year-old girl. The potential for political embarrassment of Carona was obvious. Carona asked Jaramillo to speak to District Attorney Tony Rackaukas to try to have him go easy on Don Haidl's son. Jaramillo objected. He thought it was "the wrong thing to do." Carona insisted. If Jaramillo did not approach Rackaukas, Carona would "look bad in front of Don Haidl." Despite his "real problem" with "talking to another department," Jaramillo went to the district attorney. The errand had no effect. Haidl's son and his two friends were prosecuted and ultimately convicted of rape by intoxication and other related sexual crimes.

But Jaramillo's hesitation about the Haidl errand did not sit well with Carona. More conflicts arose between the two. Carona determined that one of his campaign donors should become a harbor captain in the context of a new harbor contract with several beach cities. Jaramillo registered his disapproval. In 2003, Jaramillo warned Carona about Carona's use of a sheriff's department helicopter to conduct trysts with a number of women, one of whom was Jaramillo's former law partner. Jaramillo also warned Carona about the practice of, in effect, selling badges and concealed weapons permits to campaign donors.

Matters came to a head at a dinner meeting between Carona and Jaramillo in August 2003. Carona planned a run for Lieutenant Governor in 2006.

Jaramillo told Carona that he wanted to succeed Carona as county sheriff. Jaramillo wanted Carona's endorsement.

Carona told Jaramillo he would not endorse him. Jaramillo asked why. Carona said it was because Jaramillo "was no longer being the loyal guy" he had been.

Jaramillo launched into his grievances against Carona. He was "done covering" for Carona. "I pointed out to him that the function of my not being a loyal guy was that, instead of being the clean-cut sheriff that I started out with, he was doing these things that were not only, in my opinion, illegal, but they were just flat stupid, they were creating all sorts of grief for him and for me; and I didn't want to be a party to that; and that from that day forward he needed to know, since we were having an honest interaction, that I was done. I'm done covering with his wife. I'm done covering for him at meetings. I'm done covering with members of the board of supervisors. He's got to find somebody else to cover for him."

The Sunday before March 17, 2004, Jaramillo and Carona met at a mutual friend's wedding. Jaramillo wanted to "fix" the enmity that had developed between them. Carona rebuffed the olive branch. The "train had left the station." Jaramillo had "screwed" Carona.

Then came the firing. Carona called Jaramillo into a meeting on March 17, 2004. Present were Carona, the County's human resources officer, four other sheriffs, and the county counsel. Carona asked Jaramillo to resign. Jaramillo refused. He said he had "no reason" to resign. Carona then fired him, making reference to a document Jaramillo had signed in 2000 classifying Jaramillo as an "at-will" employee.

Jaramillo knew his rights under POBRA. He had never seen a peace officer "just summarily dismissed." He told Carona he needed to have "some sort of a hearing." The county human resources officer asked Jaramillo to talk in his office. When he closed the door, she started to cry. "This was the most unfair thing she had ever seen." Jaramillo reiterated his request for a hearing. She said, "there's nothing I can do."

Jaramillo never did receive an administrative hearing. He filed this lawsuit in 2005 on the first anniversary of his firing.

2. *The Indictments*

Jaramillo had other problems besides the loss of his job. In March 2006, almost two years after the firing, the Orange County Grand Jury handed down

a 13-count indictment, charging Jaramillo with various crimes, including (1) lying to the grand jury in 2004 about whether his wife had been paid $10,000 from a certain safety technology company, CHG Enterprises, and (2) misappropriating public funds by using a sheriff's helicopter for personal travel.

About the same time (though our record is not precisely clear when) the United States Attorney's Office for the Central District of California investigated Jaramillo and filed an information charging Jaramillo with (1) willfully filing a false federal income tax return and (2) committing "honest services fraud" under 18 United States Code sections 1341 and 1346.

Both sets of criminal charges were resolved in plea agreements. The state plea agreement involved Jaramillo pleading no contest to the charges of misappropriation of public resources and perjury before the grand jury. The federal plea agreement resulted in guilty pleas to the false tax return and honest services fraud charges. The state plea agreement came first, on January 29, 2007. The federal agreement came after, on March 12, 2007.

This lawsuit was in progress at the time. As a condition of accepting the federal plea agreement, the federal district court judge required that any recovery Jaramillo might receive from this lawsuit would have to be immediately paid back to Orange County as "restitution" for the honest services fraud.

However, in February 2011, the Ninth Circuit set aside the honest services fraud conviction. (See *U.S. v. Jaramillo* (9th Cir. 2011) 413 Fed.Appx. 979 (*Jaramillo I*).) The Ninth Circuit held that under *Skilling v. United States* (2010) 561 U.S. ___ [177 L.Ed.2d 619, 130 S.Ct. 2896], Jaramillo could not be convicted of honest services fraud because honest services fraud is limited to bribery and kickback schemes. The Ninth Circuit ruled that the federal information charging him with honest services fraud contained no allegations of bribery or kickbacks. (*Jaramillo I, supra*, at p. 981.) The Ninth Circuit also vacated and remanded the restitution order, which was based on the honest services fraud count.

■ In this appeal Jaramillo has made a formal motion asking us to take judicial notice of the Ninth Circuit's decision, filed between the opening and respondent's brief. We deny the motion as unnecessary. (See *Navellier v. Sletten* (2002) 29 Cal.4th 82, 87, fn. 5 [124 Cal.Rptr.2d 530, 52 P.3d 703] [denying request to take judicial notice of Ninth Circuit opinion involving same parties as "unnecessary"]; *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45–46, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513] ["A request for judicial notice of published material is unnecessary. Citation to the

material is sufficient."].) All Jaramillo needed to do was to cite the opinion. (Cal. Rules of Court, rule 8.1115; *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18 [72 Cal.Rptr.3d 112, 175 P.3d 1170] [Cal. court rules allow citation of unpublished federal opinions].)

In the trial of this case, Jaramillo testified (on cross-examination) that the perjury count arose out of his testimony concerning dealings he had with CHG Enterprises, a firm that was hoping to market a device to law enforcement agencies that would disable the electronics in cars being chased. He testified that, two or three years after a grand jury was investigating the relationship between CHG and the sheriff's department, prosecutors read his earlier testimony and concluded Jaramillo had committed perjury. Jaramillo testified in the case before us (over objection from the County's attorney), that he had not committed perjury, but had pled no contest only because people were using the district attorney's office to "destroy" him. "I pled no contest to stop the beating," by which he explained, "the destruction I was told about that would ultimately happen to George Jaramillo and his family, it wasn't going away."

As to the misappropriation of public funds, Jaramillo testified that he had ridden in a sheriff's department helicopter from a hospital where he had just visited his comatose mother to catch a JetBlue flight out of Long Beach to attend a White House function. When the story surfaced, Jaramillo paid $241 to the County to reimburse it for the cost of the flight because Carona did not want Carona's own use of the helicopter to come out. Jaramillo explained that the reason for his no contest plea was personal and financial exhaustion. "But I came to the conclusion that I would actually drop dead from exhaustion, be financially ruined or destroy my family if I continued to fight a machine that was not interested in prosecution but rather persecution."

## 3. *This Case*

The case was tried to the court in spring 2009. Despite the federal district court judge's restitution order, Jaramillo was awarded $183,688.66 in net backpay, calculated on his salary and benefits from March 17, 2004, to January 28, 2007. Almost all of that amount ($179,018.84) is to be paid into the county retirement system for his benefit. The court also awarded $100 to Jaramillo as "penalties" for two violations ($50 each) of POBRA.

The backpay award was based on the idea that Jaramillo's firing and the subsequent refusal of the County to afford him an administrative hearing contravened three bodies of law: (1) POBRA; (2) Fourteenth Amendment due process; and (3) Labor Code section 1102.5 (based on the idea that Jaramillo had been fired for whistleblowing on Carona's activities).

In posttrial proceedings the trial court awarded Jaramillo's lawyers about $8,400 in costs and $336,800 in fees under section 1021.5 of the Code of Civil Procedure (private attorney general). (All references to section 1021.5 are to that code.) The County has filed separate timely appeals from both the original judgment setting forth the backpay award and the injunction, and the "final amended judgment" containing the attorney fee and cost order. This court has consolidated both appeals.

## DISCUSSION

1. *"After-acquired Evidence" and Unclean Hands*

 a. *After-acquired evidence*

■ "After-acquired evidence" is a common law, equitable doctrine applicable in employment termination cases. The doctrine "comes into play when, after an employee's termination, the employer learns of employee wrongdoing that would have resulted in the employee's discharge in any event." (*Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833, 842 [77 Cal.Rptr.2d 12] (*Murillo*); see, e.g., *Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 639 [41 Cal.Rptr.2d 329] (*Camp*) [where employer learned after discharge of employed couple working as legal secretaries that felony convictions rendered them "not lawfully qualified for their jobs," couple could not "be heard to complain that they improperly lost them"].)

The County argues the trial court erred in failing to "apply" the doctrine here. The argument is unconvincing. The trial court *did* apply the doctrine. It cut off the time for the accrual of Jaramillo's backpay at the very day he pleaded no contest to two state law felonies. Arguably, though we do not decide the matter, the accrual period might have stopped running earlier had an administrative hearing been conducted and that administrative hearing established that Jaramillo engaged in wrongdoing that "relate[d] directly" to his termination. (*Camp, supra*, 35 Cal.App.4th at p. 639.) But having violated POBRA by denying Jaramillo the administrative hearing the statute requires, the County cannot now be heard to say that his no contest pleas in state court and guilty pleas in federal court retroactively meant he was unqualified for his job.

■ The statute that precludes employment in law enforcement after a felony conviction is section 1029. The key phrase in section 1029 is *"has been* convicted of a felony," past tense. (Italics added.) Under section 1029, a mere charge or allegation of felonious conduct is insufficient except in one

peculiar circumstance, not applicable here: the case of a prior adjudication of mental incompetence. (§ 1029, subd. (a)(4).)

b. *Unclean hands*

We need not address the issue of the precise standard of review that governs the equitable defense of unclean hands. (See *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 274–275 [120 Cal.Rptr.3d 893] (*Brown*) [noting differences among various appellate courts].) Regardless of whether we apply an abuse of discretion, substantial evidence, or "question of fact" standard of review (see *ibid.* [identifying three different standards which have been used by appellate courts]), the trial court was correct not to give preclusive effect to the defense. Again, it must be borne in mind that Jaramillo was never convicted of any felony until January 29, 2007. Nor, even assuming wrongful but nonfelonious behavior on Jaramillo's part, was he ever afforded an administrative hearing. Since no wrongdoing was ever established until January 29, 2007, the same analysis we have applied above to the after-acquired evidence doctrine applies to the unclean hands defense as well.

■ However, even if, arguendo, unclean hands might apply more generally or broadly than the after-acquired evidence doctrine, still no trial court error is shown. " 'Whether the defense [of unclean hands] applies in particular circumstances depends on the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries.' " (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 56 [58 Cal.Rptr.3d 225].) The focus is the equities of the relationship between the parties, and specifically whether the unclean hands affected the transaction at issue. (E.g., *Brown, supra,* 192 Cal.App.4th at p. 283 ["The unclean hands emanating from the Brown-Ross agreement did not directly affect or infect the relationship between Grimes and Brown and, most importantly, was not inequitable conduct towards Grimes."]; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 680 [35 Cal.Rptr.3d 31] ["It has long been held that the misconduct asserted in an unclean hands defense must be sufficiently related to the matter currently before the court."]; *Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 987 [90 Cal.Rptr.2d 743] ["A jury could find that Gallo's inequitable conduct occurred in the transaction related directly to the matter before the court—the marketing of Turning Leaf wine to compete with Vintner's Reserve wine—and affects the equitable relationship between the litigants."].) The misconduct must " 'infect the cause of action before the court.' " (*Moriarty v. Carlson* (1960) 184 Cal.App.2d 51, 57 [7 Cal.Rptr. 282], quoting *Carman v. Athearn* (1947) 77 Cal.App.2d 585, 598 [175 P.2d 926] ["The misconduct must infect the cause of action before the court.

Relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court."].)

Here, looking at the nature of the misconduct, the relationship of the misconduct to the claimed injuries, the equitable relationship between the litigants and whether the misconduct infects the cause of action before the court, one fact cannot be avoided: None of the wrongful conduct to which Jaramillo has admitted was related to his summary termination on March 17, 2004, by Carona.

Jaramillo was not fired because he did not include certain income from the CHG firm on his tax returns. He was not fired because he allegedly committed perjury in a grand jury investigation concerning the CHG firm. And he was not fired for the helicopter ride to catch a plane at Long Beach Airport. He was not even fired for the "honest services fraud" which the Ninth Circuit later set aside in *Jaramillo I*. He was fired because Carona doubted his personal loyalty to Carona, and Carona thought he had the power, under the 1998 and 2000 waivers, to unilaterally fire Jaramillo if he incurred Carona's personal "displeasure." We address the legal efficacy of those waivers next.

## 2. The Waivers

### a. The wording

On December 31, 1998, just before he was appointed assistant sheriff, Jaramillo signed a formal "waiver of rights." It was a short, three-paragraph document that made no direct reference to POBRA, except perhaps obliquely in its provision for firing without notice. In essence, it told Jaramillo he was an at-will employee. Its substantive provisions were: (a) Jaramillo understood the County's board of supervisors "require[d] their executive management staff to serve solely at the pleasure" of the County Sheriff and Jaramillo was only being offered the job on the condition of signing the waiver. (b) Jaramillo agreed to "serve solely at the pleasure" of the County Sheriff, "i.e., at will." And (c) Jaramillo agreed he could be "released from this position at any time without notice."

Jaramillo signed another waiver on February 28, 2000. Again it was a short, one-page document. Again there was no direct reference to POBRA. The closest the document came was to make an implicit reference to existing rights to notice, cause, and appeal that were being waived. The substantive provisions of the 2000 waiver tracked those of the December 31, 1998 waiver, i.e., affirmed that Jaramillo served "solely" at the "pleasure and

discretion" of the County Sheriff. But it spelled out a few more rights that Jaramillo was waiving: Jaramillo could be terminated "at any time without notice, cause or rights of appeal." It also added the sweetener of a severance package. Jaramillo agreed that "if terminated by the Sheriff-Coroner," he would "receive a severance package consisting of 90 calendar days of pay and health benefits from date of termination."

### b. *Analysis*

To date, there is only one case which has addressed the issue of whether, and if so, under what circumstances, rights under POBRA may be waived. That is the Supreme Court decision in *County of Riverside v. Superior Court* (2002) 27 Cal.4th 793 [118 Cal.Rptr.2d 167, 42 P.3d 1034] (*County of Riverside*). Because the parties disagree over how *County of Riverside* applies to the case before us, an extended discussion of the Supreme Court's opinion is required.

The high court in *County of Riverside* was divided over whether rights under POBRA could *ever* be waived at all. The three dissenters took the position that (1) Civil Code section 3513 (rights under law established for a "public reason" cannot be waived) in combination with (2) prior case law holding that POBRA was established for a public purpose (*Burden v. Snowden* (1992) 2 Cal.4th 556, 567 [7 Cal.Rptr.2d 531, 828 P.2d 672]) flatly precluded any possibility of waiver. (*County of Riverside, supra,* 27 Cal.4th at p. 809 (dis. opn. of Werdegar, J.) ["I thus find that Civil Code section 3513 compels the conclusion the procedural protections our Legislature has provided to public safety officers may not be waived."].) The majority, however, was willing to allow for the possibility of a valid "limited waiver" of rights under POBRA, but such a waiver would have to be narrow and "serve" the public purpose of POBRA, not "undermine" it. (*County of Riverside,* at pp. 805–806.)

The factual circumstances giving rise to *County of Riverside* were unusual. A city's police department was disbanded, with the county taking over the city's previous law enforcement responsibilities. For continuity's sake, the county offered immediate, but probationary, employment to the city's former officers. Part of the conditions of probation was a waiver of the right the officers previously had, under POBRA, to review any background investigation. One of the officers who had been switched from city to county employment had been the subject of misconduct allegations while previously employed by the city. While that officer was still on probation the county dismissed him, but gave no reason. The officer was unable to obtain employment with other law enforcement agencies, and sued the county seeking disclosure of the county's background investigation file. The trial

court ordered the county to provide redacted copies of two documents in the file, the county petitioned for a writ of mandate challenging the trial court's decision, the appellate court denied that request, and so the issue of the POBRA waiver was set up for the deliberation of the Supreme Court when it granted the county's petition for review. (*County of Riverside, supra,* 27 Cal.4th at pp. 796–798.)

On the waiver issue, the *County of Riverside* majority first announced a rule against any "blanket" waivers of POBRA rights. (*County of Riverside, supra,* 27 Cal.4th at p. 804 ["Therefore, we think the Bill of Rights Act is, like many other statutory schemes enacted for the protection of a class of employees, not subject to blanket waiver."].)

But then the court defined the waiver issue before it narrowly. It noted that the case arose where a peace officer had been effectively hired *without* the usual background investigation required of new recruits. (See *County of Riverside, supra,* 27 Cal.4th at pp. 798–799 [noting requirement of background investigation prior to hiring]; *id.* at p. 805 [defining issue as whether an "applicant" can waive POBRA rights "with respect to a background investigation, while otherwise retaining" other rights under POBRA].) Thus the court focused on the anomalous conflation, in the case before it, of the county's dual roles of prehiring investigator and posthiring *"actual"* employer. (27 Cal.4th at p. 805, original italics.) Under such circumstances, the majority noted, there was the danger that a waiver of POBRA rights vis-à-vis background investigations could mean that a newly appointed peace officer would have "no rights" under POBRA, and if that was the case, the result would be unacceptable because POBRA's purpose of promoting stable employer-employee relations would be "undermine[d]." (27 Cal.4th at p. 805.)

But then the *County of Riverside* court articulated a distinction that would ultimately carry the day for the county. The court accepted a distinction between files relating to prehiring conduct and posthiring conduct. (*County of Riverside, supra,* 27 Cal.4th at p. 806.) To the "limited extent" of matters arising *"prior to"* employment with the county, the *County of Riverside* court was willing to enforce the waiver. (*Ibid.,* original italics ["To that limited extent, we agree with the County that an employee may waive the protections of the Bill of Rights Act."].)

■ The majority's point in enforcing the waiver was that the waiver would not "undermine" POBRA. (*County of Riverside, supra,* 27 Cal.4th at p. 806 ["Where the employee's waiver is limited to an investigation of matters that arose prior to employment, and where the waiver expires after one year, so the employee is not subject to continuing investigation long after

being hired, enforcement of the waiver would not particularly undermine the public purpose of the Act."].) Indeed, the court noted the paradox that the particular waiver before it actually "serve[d]" the "public purpose" of POBRA by "facilitating an earlier hiring date for new peace officers who are transferring from other agencies." (27 Cal.4th at p. 806.) And in fact it was the invocation of the undermining-serving test which was the main difference between the *County of Riverside* majority and dissenters: For the majority, a limited waiver in the prehiring context that served, and certainly did not undermine, the purposes of POBRA was enforceable.

The dissenters thought that the majority had focused on the wrong question altogether. For the dissenters, the relevant question was not whether the waiver undermined or served POBRA's public purposes. They saw a blanket prohibition on waivers, period. (See *County of Riverside, supra*, 27 Cal.4th at p. 809 (dis. opn. of Werdegar, J.) ["That on the particular facts of the case a waiver would or would not undermine the public purpose underlying the statutory scheme is irrelevant. We are not at liberty to second-guess the wisdom of the Legislature's blanket prohibition of waivers of rights granted for a public benefit . . . ."].)

■ There are several reasons the 1998 and 2000 waivers before us do not fit within the small class of "limited" waivers allowed by *County of Riverside*. First, these waivers were in substance blanket waivers, waiving important rights (notice and administrative hearing in particular) under POBRA. All seven justices in *County of Riverside* were clear in their condemnation of "blanket" POBRA waivers.

Second, unlike the waiver upheld in *County of Riverside*, the 1998 and 2000 waivers here were entirely prospective. While the officer in *County of Riverside* had "full knowledge" that his waiver might result in the disclosure of allegations made against him when he worked for his previous employer (see *County of Riverside, supra*, 27 Cal.4th at p. 807 ["he knew or should have known that he might find himself in his current situation"]), Jaramillo here had no reason to suspect he was in his boss's ill graces when he signed the 1998 and 2000 waivers. (The record in fact is just the opposite. Carona himself told Jaramillo the 2000 waiver had no effect and was implemented so as to "present" some holdover sheriffs from the previous administration with the "opportunity to retire.")

■ Third, and most importantly, applying the *County of Riverside* majority test, the waivers here would clearly undermine POBRA and not serve it.'If these waivers were enforced, the protections afforded high-ranking peace officers by POBRA could be easily circumvented. And we know that POBRA applies even to chiefs of police. (*Binkley v. City of Long Beach* (1993) 16

Cal.App.4th 1795 [20 Cal.Rptr.2d 903]; *Gray v. City of Gustine* (1990) 224 Cal.App.3d 621 [273 Cal.Rptr. 730].) If it applies to police chiefs, it applies to assistant sheriffs, and in fact the County makes no argument that assistant sheriffs do not come within the ambit of POBRA.

The County does make a related argument, though, that the trial court erred by ignoring the overall effect of the waivers, which was, after all, to categorize Jaramillo as an "at-will" employee. But that argument is duplicative of its general waiver argument, albeit if anything, the argument underscores the tendency of these waivers to undermine the purposes of POBRA. To make a high-ranking peace officer an at-will employee is, in effect and as happened here, to strip that officer of the rights to notice of discipline and an administrative hearing that are central to POBRA.

3. *Labor Code Section 1102.5*

An independent basis for the trial court's judgment was that Jaramillo was fired in contravention of the state employee whistleblower statute, Labor Code section 1102.5. The applicable subdivision of the statute, subdivision (b), provides: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

The record indicates that Carona himself was the sole recipient of Jaramillo's whistleblowing. Jaramillo warned Carona directly about Carona's "illegal" and "flat stupid" use of the County helicopter as a place for his sexual assignations. He also warned Carona about Carona's practice of "selling" badges and concealed weapons permits to campaign contributors.

There is some discussion in the briefs as to whether Jaramillo might have also gone to Orange County District Attorney Tony Rackaukas about some illegal activity on Carona's part. The record, however, will *not* support any such finding. When asked "did you at any time go to Tony Rackaukas and say, 'District Attorney Rackaukas, Michael Carona has engaged in illegal conduct or is engaging in illegal conduct, and he needs to be investigated?' " Jaramillo's answer was a firm, "I did not." While the record shows that Rackaukas and Jaramillo often lunched or dined together and had an "ongoing dialog," in light of Jaramillo's unequivocal answer to the illegal conduct question we must proceed on the basis that his only whistleblowing as such was done directly to Carona himself.

That said, there is no question that Jaramillo's warning to Carona fits within the literal definition of whistleblowing under Labor Code section

1102.5. Jaramillo did indeed "disclos[e] information" to a "law enforcement agency," namely the Orange County Sheriff's Department (in fact, the very top officer in that law enforcement agency), and the information "disclose[d]" violations of state and federal statutes. At the very least we may note that Jaramillo's warnings about selling badges and concealed weapons permits were harbingers of a later federal indictment of Carona for giving Haidl a " 'Get Out of Jail Free' Card." (*U.S. v. Carona* (C.D.Cal., May 2, 2008, No. SA CR 06-224-AG) 2008 WL 1970199, pp. *1–*2 [noting that count one of a federal indictment "alleges that in exchange for money and gifts from Don Haidl, Michael Carona 'provided co-conspirator Haidl with full access to the resources of the Orange County Sheriff's Department and a "Get Out of Jail Free" card . . . .' "].)

In this appeal the County does not attempt to argue that Jaramillo's warnings to Carona do not fall within the literal meaning of Labor Code section 1102.5. Rather, the County, relying on a Federal Circuit case, *Huffman v. Office of Personnel Management* (Fed. Cir. 2001) 263 F.3d 1341 (*Huffman*), argues that a report to one's own employer negates any "factual basis for finding the required nexus between" Jaramillo's firing and his statements to Carona. The underlying point, of course, is that Jaramillo did his whistleblowing where only the wrongdoer himself could hear the whistle.

There are two reasons the County's argument is not persuasive. First, California precedent is to the direct contrary. (*Gardenhire v. Housing Authority* (2000) 85 Cal.App.4th 236, 242 [101 Cal.Rptr.2d 893] (*Gardenhire*) [housing authority employee who reported to authority commissioners that contract mover was attempting to pad moving bills by arranging for moving on weekends and holidays not precluded from suing for retaliation for her subsequent firing].) While *Gardenhire* is cited and relied upon in Jaramillo's respondent's brief, the County does not address the case in its own reply brief.

Second, *Huffman*, the authority relied on by the County, is inapposite. *Huffman* was a case that construed the federal Whistleblower Protection Act of 1989 (Pub.L. No. 101-12 (Apr. 10, 1989) 103 Stat. 16). (*Huffman, supra,* 263 F.3d at p. 1344.) The federal statute is broader than California's Labor Code section 1102.5. While California's statute is pegged on a "violation" of state or federal statutes or regulations, the federal statute includes warnings of " 'a gross waste of funds.' " (263 F.3d at p. 1347, quoting 5 U.S.C. § 2302(b)(8)(A).) Given that breadth, the *Huffman* court was naturally reluctant to hold that an employee who told his supervisor that a particular services contract constituted a " 'gross waste of funds and gross mismanagement' " (263 F.3d at p. 1345) came within the purview of the federal statute. Said the *Huffman* court: " 'Discussion and even disagreement with supervisors over job-related activities is a normal part of most occupations. It is

entirely ordinary for an employee to fairly and reasonably disagree with a supervisor who overturns the employee's decision.' " (*Id.* at p. 1348.) In the case before us, by contrast, we do not have an "entirely ordinary" disagreement about a fairly debatable contract. At the very least, Jaramillo warned Carona about the illegality of selling badges ("get-out-of-jail-free cards") to campaign contributors.

■ Finally, we observe that the County's real complaint is about the wording of the statute itself. We recognize the anomaly here. A report of wrongdoing to the very person who is engaged in the wrongdoing is covered by the statute when the wrongdoer also happens to be the county sheriff, who, under the circumstances, may be the last person who might be willing to do anything about it. (But see our discussion below on the topic of whether the injunction obtained by Jaramillo established a "public benefit.") But that anomaly is properly addressed to the Legislature, not this court.

### 4. *Injunctive Relief*

■ Part of the judgment is a provision requiring the County to amend its executive management waiver forms to expressly include language that no POBRA rights are included. The County argues that Jaramillo, having been fired and unable to return to police work after his 2007 convictions, had no standing to request such an order since he could no longer benefit by it. The argument fails because under section 3309.5, once the court found a violation of POBRA, it had no choice but to order an "appropriate injunction," regardless of Jaramillo's own standing.

The County argues, in its reply brief, that section 3309.5 is limited to injunctions that prevent the relevant police department from taking any punitive action against "the public safety officer." (Original underscoring.) The County's argument, however, relies on a misquotation of the statute.

Here is what the County says in its reply brief: "Instead, Plaintiff relies on Government Code § 3309.5(d)(1) which relates to the issuance of injunctive relief to prohibit 'the public safety department from taking any punitive action against *the public safety officer.*' (Emphasis added.) The statute, on its face, has no relevance to this action where 'the public safety officer', i.e., Plaintiff, can never be employed by the County, and he will never have any 'punitive action' taken against him in the future—since he is a convicted felon who will never be employed with the County."

Now here is what section 3309.5, subdivision (d)(1) actually says, in its entirety: "In *any* case where the superior court finds that a public safety department has violated any of the provisions of this chapter, the court *shall*

*render appropriate injunctive or other extraordinary relief* to remedy the violation and *to prevent future violations of a like or similar nature, including, but not limited to,* the granting of a temporary restraining order, preliminary injunction, or permanent injunction prohibiting the public safety department from taking any punitive action against the public safety officer." (Italics added.)

 As the italicized words show, the trial court was required to render appropriate injunctive relief to prevent future violations of POBRA of a similar nature to the one experienced by Jaramillo. The County has ignored the words "including, but not limited to" in the statute.

## 5. Attorney Fees

The County makes two basic arguments regarding attorney fees. First, it contends on various grounds that no attorney fees should have been awarded at all. Second, it contends that even if some fees should have been awarded, they were too high.

### a. Arguments against any fees at all

The Ninth Circuit not only reversed Jaramillo's conviction for honest services fraud, but it vacated and remanded the restitution ruling. Since the Ninth Circuit's opinion was clear that the basis for the restitution ruling was the now vacated count for honest services fraud against the County, that leaves only Jaramillo's conviction for filing a false federal tax return. The victim of that crime was not the County. Therefore there is no basis, originating in the federal conviction, to prevent an award of fees to Jaramillo *if* fees are otherwise appropriate. In the wake of the Ninth Circuit reversal in *Jaramillo I*, the County offers no defense in its reply brief of the arguments based on the federal district court's now vacated restitution order made in its opening brief.

Four of the five arguments presented against the award of any fees at all are predicated on the viability of the federal district court's restitution order. The argument that the large amount of the fee award "cannot be reconciled" with the de minimis nature of a total of $100 in fines is unpersuasive. The argument is impliedly premised on the theory that Jaramillo obtained no real recovery against the County, because he would have to give the backpay award back anyway. Under *Jaramillo I*, that is no longer true. The argument that the fee award was improperly styled as a "cost" order is also only relevant as to the issue of the trial court's circumvention of the federal district court's attempt to recapture for the County any fee award against the County. The same may be said for the argument that the trial court violated principles

of "comity." With the Ninth Circuit ruling, both state trial court judgment and the federal court are now in sync.

The County, however, presents one argument that is not dependent on the federal district court's restitution order. The County contends that Jaramillo's litigation does not qualify under the private attorney general statute, Code of Civil Procedure section 1021.5, because it did not confer a significant benefit on a large class of persons. Actually, there are three elements to a private attorney general fee award under the statute, (1) "the enforcement of an important right affecting the public interest," (2) the conferring of a "significant benefit" on "the general public or a large class of individuals" and (3) "the necessity and financial burden of private enforcement renders the award appropriate." (*New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 848–849 [114 Cal.Rptr.3d 504].) The County makes no argument as to the last of these elements, and in the context of this case, the first two elements, i.e., the importance of the right and the benefit conferred, may be considered together.

Here, both "public interest" and "large class" of people prongs are present. The injunction does not just protect those few executive-level sheriffs who will now know that they are not waiving POBRA protections. It will also inure to the benefit of the citizens and taxpayers of the County by lessening the probabilities of abuse and corruption in the sheriff's office.

This is where the attorney fee issue meets the whistleblower issue. Under the injunction, any person occupying the office of the county sheriff will not be able to assume, as this record shows Sheriff Carona did, that he or she may ignore warnings of wrongdoing (or even mere mismanagement) from high-level sheriffs and then be able to cover up the fact of those warnings with an in-the-corner "at-will" termination. Assistant sheriffs and other executive-level peace officers will clearly have the right to a "name-clearing" administrative hearing. (*Binkley, supra*, 16 Cal.App.4th at p. 1807.) Any attempt to hush up a whistleblower by termination without an administrative hearing would be futile.

In this case, for example, if the injunction had been in effect in March 2004, Sheriff Carona would have known that he could not just fire Assistant Sheriff Jaramillo without any public consequences. He would have known that at the very least Jaramillo would be entitled to an administrative hearing. Perhaps, under such circumstances, Carona might have been willing to heed Jaramillo's counsel and curtail his wayward ways.

b. *Amount of fees*

The County's final argument concerns the amount of fees. Three points are argued: (1) Jaramillo's counsel's practice of making billing entries in

"blocked" style with "vague and ambiguous descriptions"; (2) Jaramillo's counsel's inclusion of 18.2 hours spent on federal sentencing; and (3) a 15 percent fee multiplier. We should note here that Jaramillo's counsel's fee request does indeed consist of very general entries, e.g., "Trial prep." for the five hours spent on April 19, 2009, or "T/C-Client" for the 0.3 hours spent July 21, 2009.

The amount of fees under Code of Civil Procedure section 1021.5 is classically tested under the abuse of discretion standard. (E.g., *Riverside Sheriffs' Assn. v. County of Riverside* (2007) 152 Cal.App.4th 414, 421 [61 Cal.Rptr.3d 295] [in POBRA case applying § 1021.5, noting that review for the "amount of fees" was abuse of discretion standard].)

 On the first argument, block billing is not objectionable "per se," though it certainly does increase the risk that the trial court, in a reasonable exercise of its discretion, will discount a fee request. (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1325 [81 Cal.Rptr.3d 866].) Block billing is particularly problematic in cases where there is a need to separate out work that qualifies for compensation under Code of Civil Procedure section 1021.5 from work that does not. (See *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 689 [98 Cal.Rptr.2d 263] (*Bell*) [block billing made it "virtually impossible" to separate out compensable Ralph M. Brown Act (Gov. Code, § 54950 et seq.) violation work from other work].) Here, however, one fact stands out, justifying block billing in the peculiar facts of this case: Until *Jaramillo I* came down in February of 2011, Jaramillo faced the prospect of further proceedings in the federal court on the honest services fraud charge, and so his counsel, prudently, took pains not to disclose attorney-client confidences or work product impressions in his billing entries. Moreover, in this case, unlike *Bell*, there was no need to separate out covered from uncovered work (we address the federal work issue immediately below), so the trial court was certainly reasonable in accepting blocked entries given the criminal exposure that Jaramillo faced.

As to the second argument, this very appeal itself demonstrates the direct relationship between the federal district court's sentencing order, the unclean hands defense, and the attorney fee question. Moreover, the work concerning the effect of the federal restitution order would obviously bear on the question of whether Jaramillo himself might have to pay his counsel's fees, or if they might be paid for Jaramillo by the County.

Finally, a 15 percent multiplier is reasonable given that all the circumstances of the case, including a contingency fee agreement and the possibility that Jaramillo's counsel faced, at the very least, a degree of public opprobrium (and perhaps quite rightly so) for Jaramillo's role in the Haidl case and his own dealings with the CHG firm.

## DISPOSITION

The judgment is affirmed. Respondent is to recover his costs on appeal. We also deem his work on this appeal to qualify under Code of Civil Procedure section 1021.5.

The trial court will have discretion to assess the proper reasonable amount of fees on appeal in further proceedings.

Moore, J., and Fybel, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 22, 2012, S198559. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.