Filed 11/7/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| EDWARD MANAVIAN, | C077843 |
| Plaintiff and Appellant, | (Super. Ct. No. 06AS05098) |
| v. | |
| DEPARTMENT OF JUSTICE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne W.L. Chang, Judge. Affirmed.

Charles D. Crawford for Plaintiff and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Chris A. Knudsen, Senior Assistant Attorney General, Fiel D. Tigno, Supervising Deputy Attorney General, Terry Senne and Joshua C. Irwin, Deputy Attorneys General, for Defendant and Respondent.

1

A career executive assignment (CEA) is "an appointment to a high administrative and policy influencing position within the state civil service in which the incumbent's primary responsibility is the managing of a major function or the rendering of management advice to top-level administrative authority.  Such a position can be established only in the top managerial levels of state service and is typified by broad responsibility for policy implementation and extensive participation in policy evolvement.  Assignment by appointment to such a position does not confer any rights or status in the position other than provided in Article 9 . . . of Chapter 2.5 of Part 2.6." (Gov. Code, § 18547.)[1]  The rights conferred by article 9 are the rights of all civil service employees relating to punitive actions, except that the termination of a CEA is *not* a punitive action.  (§ 19889.2.)

CEA positions are part of the general civil service system, but an employee enjoys no tenure in a CEA.  (*Professional Engineers in Cal. Government v. State Personnel Bd.* (2001) 90 Cal.App.4th 678, 689, 692 (*Professional Engineers*).)  The CEA legislation was created to encourage the use and development of well-qualified selected executives. (*Campbell v. State Personnel Bd.* (1997) 57 Cal.App.4th 281, 293.)  As a result of the need for flexibility at this level, the appointing authority may terminate a CEA without cause.  (*Professional Engineers,* at p. 692.)

This case illustrates the need for flexibility in terminating a CEA position. Plaintiff Edward Manavian held a CEA position as chief of the Criminal Intelligence Bureau (Bureau), part of the Department of Justice (DOJ).  Formed after the September 11 terrorist attacks, the Bureau is a partnership of local and state law enforcement agencies created pursuant to a memorandum of understanding (MOU) between the Governor and Attorney General.  The Bureau's mission is to facilitate local,

---

[1] Undesignated statutory references are to the Government Code.

state, and federal law enforcement intelligence collection and sharing. In particular, Manavian's job description was to cooperate with local, state, and federal law enforcement agencies to prevent terrorism and related criminal activity.

However, Manavian's relationships with state and federal decisionmakers were not good. The director and deputy director of the state Office of Homeland Security were ready to withdraw from the DOJ partnership and refused to work with Manavian. Richard Oules, Manavian's superior, decided to terminate Manavian's CEA position because of his dysfunctional relationship with federal and state representatives and because of Manavian's hostility toward Oules.

As a chief designated as a peace officer by the Attorney General, Manavian is also entitled to the protections of the Public Safety Officers Procedural Bill of Rights Act (POBRA), section 3300 et seq. (Pen. Code, § 830.1, subd. (b); § 3301.) POBRA provides certain protections pertaining to the investigation, interrogation, and administrative appeal of punitive actions. (§§ 3303, 3304, subd. (b).) This case is premised on the claim that the termination of Manavian's CEA position was a punitive action protected by POBRA, despite clear language to the contrary in section 19889.2.

Manavian also claims that certain actions he took in liaising with other state and federal homeland security representatives, then reporting potentially illegal policy proposals, were protected by the California whistleblower statutes.

We shall conclude that POBRA protections were not triggered by the termination of Manavian's CEA position, and that he is not protected as a whistleblower.

FACTUAL AND PROCEDURAL BACKGROUND

Manavian's complaint contains a long list of grievances, but the pertinent facts are the following. Manavian began working as a special agent with DOJ in 1984. In September 2001, Manavian was appointed acting chief of the newly formed Bureau. The Bureau's mission is to provide collection, coordination, analysis, investigation, and dissemination of criminal intelligence regarding organized crime, street gangs, and

3

terrorist activity to federal, state, and local law enforcement agencies. The California Anti-Terrorism Information Center (Anti-Terrorism Center) was created within the Bureau. The Anti-Terrorism Center was created in response to the September 11, 2001, terrorist attacks for the purpose of improving intelligence sharing.

The Bureau is within the DOJ's Division of Law Enforcement (Division), and the position of chief of the Bureau is under the direction of the director and deputy director of the Division. The director, in turn, reports to the chief deputy attorney general for administration and policy, who reports to the Attorney General.

In August 2003, Manavian was promoted to chief of the Bureau. Part of his job description was to cooperate with local, state, and federal law enforcement agencies, to prevent terrorism and related criminal activity. The chief position was a CEA.

As indicated, a CEA is "an appointment to a high administrative and policy influencing position within the state civil service in which the incumbent's primary responsibility is the managing of a major function or the rendering of management advice to top-level administrative authority. Such a position can be established only in the top managerial levels of state service and is typified by broad responsibility for policy implementation and extensive participation in policy evolvement." (§ 18547.) The purpose of creating CEA positions was to "encourage the development and effective use of well-qualified and carefully selected executives." (§ 19889.) Relevant to this action, the regular civil service provisions governing examination, selection, classification, and tenure do not apply to CEA's. (§ 19889.2.) Most importantly, although civil service provisions regarding "punitive actions" apply to CEA's, section 19889.2 explicitly states that termination of a CEA is not a punitive action. A CEA does, however, have a right to appeal the termination of a CEA assignment where the termination was for reasons prohibited by chapter 10 of the State Civil Service Act (§ 18500 et seq.), which prohibits discrimination on the basis of, inter alia, age, race, religion, disability, gender, gender identity, and sexual orientation (§ 19889.2). When a CEA is terminated, the employee

4

may be reinstated to a civil service position that is the equivalent of the position he or she held at the time of the CEA appointment. (§ 19889.4.)

In 2005, Oules was appointed DOJ's director of the Division. Consequently, Manavian reported to Oules.

Just prior to Oules becoming director, Manavian sent a letter to the director of the Homeland Security Operations Center of the United States Department of Homeland Security (Operations Center). Manavian sent the letter in his capacity as chairman of the executive board of the Joint Regional Information Exchange System (JRIES), on which he served as a representative of DOJ. Manavian informed the director of the Operations Center that the executive board had voted to discontinue its relationship with the Operations Center, stating: "The consensus of the Board is that the [Operations Center] has 'hi-jacked' the system and federalized a successful, cooperative federal, state, and local project."

In August 2005 Oules wrote to his superior, Steve Coony, the chief deputy attorney general for administration and policy. Oules relayed that the relationship between Manavian and the federal Department of Homeland Security and state Office of Homeland Security was "not good." He stated that the Office of Homeland Security was "very frustrated" with Manavian because he was "continuing to be an obstruction to progress." Gary Winuk, the deputy director of the state Office of Homeland Security informed Oules that they were "to the point where they have considered withdrawing from the DOJ partnership and setting up house with Sacramento Sheriff at McClellan." The director of the Office of Homeland Security told Oules that Manavian was not collaborative, would not work with them, and that the relationship was dysfunctional.

After he became director of the Division, Oules decided to make certain changes to the Division's operations. Oules believed that the federal government should primarily fulfill the national role, and that the Division and Bureau should focus on California law enforcement. He decided that out-of-state travel was not always in DOJ's best interests

5

and decided to scrutinize requests for such travel. Oules also decided to conduct an internal assessment of DOJ's bureaus and operations. Oules decided to appoint himself as the representative on the state's various high-intensity drug trafficking area executive boards, replacing the various department employees who had previously acted as DOJ's designated representatives.

Oules and Manavian discussed the Bureau's operations, direction, focus, and priorities, and disagreed on some of these matters. Oules questioned the Bureau's effectiveness. When Oules told Manavian that he wanted Manavian to focus on California and stay in California, Manavian replied that Oules did not understand the job. When Manavian requested approval for a trip to Washington D.C. on official business to the Department of Homeland Security, Oules denied the request. Manavian nevertheless traveled to Washington D.C. and met with the Department of Homeland Security, telling Oules he was on vacation. Oules found out from conversations with the federal Department of Homeland Security that Manavian was not communicating with them, and that they found him to be argumentative, unreasonable, and untrustworthy.

Oules decided to terminate Manavian's CEA position in part because he had a dysfunctional toxic relationship with senior leadership at the federal Department of Homeland Security, and he was being ineffective as a representative there. Additionally, the deputy director of the state Office of Homeland Security told Oules that Manavian was obnoxious, arrogant, and would not return calls. In January 2006, the deputy director of the state Office of Homeland Security told Oules that if Manavian was going to be managing the State Threat Assessment Center, one of the intelligence sharing and public safety operations on which he was working with Manavian, he would not assign Office of Homeland Security personnel to staff the joint operation because he did not trust Manavian's supervision.

On January 19, 2006, Manavian sent an e-mail to Oules, and copied the e-mail to the chief deputy attorney general, Steve Coony, and the assistant chief of the Bureau,

6

Allen Benitez. Manavian stated: "Your comments . . . reflected negatively on the work that our folks do and the fact that our employees are aware of your feelings. I advised you at that meeting the effect it has on their morale. [¶] I just wanted to let you know that tomorrow, a number of [Bureau] employees are receiving awards from FBI Director Mueller, which will be presented by the [assistant director in charge] of the LA FBI office, at a ceremony for their work in successfully thwarting an impending act of terrorism in California. [¶] It's unfortunate that the recognition our folks get comes from the outside and not appreciated internally." Oules viewed these comments as negative and hostile. Chief Deputy Attorney General Coony found the e-mail confrontational and inappropriate, and found it reflected a poor working relationship between Manavian and Oules that was not acceptable. Coony was concerned that the relationship between the two was negatively affecting the operations of the Division.

Finally on January 25, 2006, Manavian sent Oules an e-mail criticizing Oules's management style as not "inclusive as to the decision process," causing "a major disruption in [Manavian's] bureau's ability to function." Manavian accused Oules of not recognizing the great strides the Bureau had made, and warning that any changes in the way the Bureau operated would be detrimental to the people of California. Manavian rejected Oules's proposed changes, stating that they would "take this department backwards and have a major impact on services provided to local law enforcement . . . ." Manavian again copied Coony and Benitez on the e-mail. Coony's opinion was that the e-mail showed hostility, an absence of confidence or trust, and an unwillingness to support Oules in managing the Bureau. Coony supported Oules's decision to terminate Manavian's CEA position.

On February 15, 2016, Oules notified Manavian that his CEA position was being terminated effective March 8, 2006, and that he was being reassigned to the Bureau of Narcotic Enforcement as an assistant bureau chief.

7

Manavian asked for an explanation for the termination of his CEA position. Oules responded that the action was not disciplinary in nature, and that since the CEA classification allowed for the flexible selection and termination of high-level management positions, he had concluded he wished to take a different approach to matters within the Bureau. Oules further stated that he had received numerous complaints from the law enforcement community regarding the Bureau's lack of cooperation, which, coupled with Manavian's lack of communication, convinced him it would be impossible to continue with the status quo. Furthermore, Oules indicated he wanted to foster a more cooperative relationship between the Bureau and the federal Department of Homeland Security and state Office of Homeland Security.

Manavian asked for the names of the people who had complained about him and the nature of their complaints. Oules responded that the termination of Manavian's CEA position was not a termination for cause such that the department was required to set for reasons, nor was it disciplinary in nature. Manavian continued to press for names and specifics. Oules finally wrote: "The action you complain of was not a demotion. Your C.E.A. position was an at will appointment that was terminated not for cause, but because I felt that the [Bureau] needed a fresh approach to its mission of supporting the law enforcement community. There is no punitive accusation attached to the action taken. [¶] Again, as to the specifics of the complaints I received, I do not believe it would be in the best interests of the Department of Justice to provide you with such information. Moreover, the complaints that I received were never reduced to writing so there are no records to provide you with."

Manavian appealed Oules's decision to terminate his CEA position to the State Personnel Board and filed a whistleblower complaint.[2] This action followed.

---

[2] Respondent's request for judicial notice of his appeal to the State Personnel Board filed February 19, 2016, is granted.

The first amended complaint named the State of California and the following defendants as individuals, not in their official capacity:  William Lockyer (who was Attorney General), Patrick Lunney (who was director of the Division prior to Oules), Joe Doane (who was deputy director of the Division), Wifredo Cid (who was the assistant bureau chief for the mission support branch), Don Hayashida (who was chief of personnel programs), Steve Coony (who was chief deputy attorney general), and Oules. The complaint alleged causes of action for termination in violation of public policy, violation of Labor Code section 1102.5 (retaliation for disclosing information), violation of the Whistleblower Act, violation of Government Code section 3300 et seq. (POBRA), violation of Government Code section 12940 et seq. (discrimination), intentional infliction of emotional distress, and violation of Penal Code section 832.5 (violation of procedures following complaint against law enforcement personnel) against defendant Lockyer.  Manavian asserts that he subsequently dismissed the named defendants.

Defendant State of California filed a motion for summary judgment, or in the alternative summary adjudication.  The trial court granted summary adjudication of all causes of action except the cause of action for intentional infliction of emotional distress, and for that reason denied the motion for summary judgment.  Manavian dismissed his cause of action for intentional infliction of emotional distress to facilitate this appeal.

DISCUSSION

I

POBRA Does Not Apply to Termination of a CEA

The question presented is whether as a matter of law the provisions of POBRA apply to the termination of a CEA position.

*A.  Career Executive Assignments*

As indicated, a CEA is within the state civil service, but is a top-level administrative and policy-influencing position at the executive level.  (§§ 18547, 19889.) "The interdependent purposes of the program are to give scope to younger civil service

9

employees possessing extraordinary ability and initiative, and to enhance the ability of the policy-forming heads of state agencies to perform efficiently the tasks for which the public holds them accountable." (*Cryor v. State Personnel Bd.* (1967) 253 Cal.App.2d 100, 102.) The holder of a CEA position "enjoys no tenure in his position, i.e., no right to the position absent cause. . . . The appointing authority may terminate a career executive without cause, for any reason excepting various forms of invidious treatment-- including termination for political affiliation or opinions. [Citations.] When a person leaves a CEA position, the person has the right to return to the position whence the person came, unless terminated with cause, in which case the person receives the protections enjoyed by all other permanent civil service employees facing discipline." (*Professional Engineers, supra,* 90 Cal.App.4th at p. 692.)

Section 19889.2 provides in pertinent part: "The provisions of this part relating to punitive actions shall apply to all employees serving in career executive assignments, *except that termination of a career executive assignment as provided for in Section 19889.3 is not a punitive action.*" (Italics added.) Even though section 19889.2 is located in part 2.6 of division 5, title 2 of the Government Code, the reference to "this part" must refer to part 2. Part 2 is the State Civil Service Act. (§ 18570.) Section 19889.2 also states that "[t]he provisions of this part governing the examination, selection, classification, and tenure of employees in the regular civil service shall not apply to 'career executive assignments' unless provided for by State Personnel Board rule." Provisions governing examination, selection, classification, and tenure of employees are found in part 2, not part 2.6 of division 5. (§§ 18702-19593.)

*B. POBRA*

The Supreme Court has explained the purpose of POBRA as follows:

"Courts have long recognized that, while the off-duty conduct of employees is generally of no legal consequence to their employers, the public expects peace officers to be 'above suspicion of violation of the very laws [they are] sworn . . . to enforce.' [Citations.] Historically, peace

10

officers have been held to a higher standard than other public employees, in part because they alone are the 'guardians of peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them.' [Citation.] To maintain the public's confidence in its police force, a law enforcement agency must promptly, thoroughly, and fairly investigate allegations of officer misconduct; if warranted, it must institute disciplinary proceedings.

"The purpose of the Act is 'to maintain stable employer-employee relations and thereby assure effective law enforcement.' [Citations.] The Act requires that law enforcement agencies throughout the state afford minimum procedural rights to their peace officer employees. [Citations.] Thus the Act secures for peace officers--when off duty and not in uniform--the right to engage, or to refrain from engaging, in political activity (§ 3302); it protects against punitive action or denial of promotion for the exercise of procedural rights granted under its own terms or under an existing grievance procedure (§ 3304, subd. (a)); it provides that no adverse comment be entered in an officer's personnel file until after the officer has been given an opportunity to read and sign the comment (§ 3305); it mandates that when an adverse comment is entered in a personnel file, the officer shall have 30 days to file a written response to be attached to the adverse comment in the file (§ 3306); and it protects against compelled disclosure, except in limited circumstances, of an officer's financial status (§ 3308)." (*Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 572, fn. omitted.)

POBRA's procedural protections were intended to "balance the public interest in maintaining the efficiency and integrity of the police force with the police officer's interest in receiving fair treatment." (*Jackson v. City of Los Angeles* (2003) 111 Cal.App.4th 899, 909.) With respect to punitive actions, POBRA provides rights pertaining to investigation, interrogation, and administrative appeal of punitive actions. (§§ 3303, 3304, subd. (b).) POBRA defines "punitive action" as "any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment." (§ 3303.) The question is whether the termination of Manavian's CEA position was a punitive action for POBRA purposes because it involved a transfer, demotion, or reduction in salary.

11

*C. Analysis*

Manavian argues POBRA governs his CEA termination pursuant to the rule that a specific statute prevails over a general statute. However, we agree with DOJ that POBRA does not apply to the termination of a CEA. "Statutes must be construed with reference to the entire statutory scheme of which they are a part [citation] so as to harmonize their effect in conformity with legislative intent [citations]. Insofar as it is possible to do so, seemingly conflicting or inconsistent statutes will be harmonized so as to give effect to each." (*Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 757.) We conclude that POBRA and the CEA provisions were intended to address different situations, and are not in conflict.

POBRA was enacted to give employment protection to peace officers who, because of the nature of their interaction with the public, are particularly vulnerable to complaints from the public. As examples, POBRA has been properly invoked in the case of a citizen's complaint of police brutality (*Aguilar v. Johnson* (1988) 202 Cal.App.3d 241), an investigation into an officer's involvement in a prostitution business (*Gilbert v. City of Sunnyvale* (2005) 130 Cal.App.4th 1264, 1271, 1293), and an internal affairs investigation into whether an officer was conducting police officers' association business while on duty (*Upland Police Officers Association v. City of Upland* (2003) 111 Cal.App.4th 1294, 1297). In this case, Manavian's CEA position was terminated because Oules was unsatisfied with the way Manavian was managing the Bureau, not because of complaints that Manavian had committed some misconduct. The CEA provisions were specifically designed for this situation, while the POBRA provisions were not.

The CEA statutes were first enacted in 1963, and as enacted, former section 19221 provided that termination of a CEA was not a punitive action. POBRA was enacted 13 years later, in 1976, giving certain rights to officers subject to "punitive action." (§ 3303.) When POBRA was enacted, the State Civil Service Act still referred to adverse actions as punitive actions. (Historical and Statutory Notes, 33A West's Ann. Gov. Code

12

(2009 ed.) foll. § 19570, p. 299.)  The 1981 revisions to the State Civil Service Act replaced "punitive action" with "adverse action" throughout the act.  The same year, the Legislature deleted the CEA statutes from part 2 and added them in their present location in part 2.5, but did not change the language of these statutes from "punitive action" to "adverse action," as with the State Civil Service Act.  Thus, when the Legislature reenacted section 19889.2, and provided that termination of a CEA was not a "punitive action" language, it would have been aware that POBRA also applied to "punitive actions."

By exempting the termination of CEA positions from the definition of "punitive actions" under POBRA we give effect to the provisions of POBRA and recognize the Legislature's express exception to the statutory scheme.  POBRA gives officers certain rights when an employer is taking a punitive action, but in accordance with section 19889.2, termination of a CEA is not a punitive action, thus POBRA rights do not apply.  Section 19889.2 thus provides an express exception to section 3303, subdivision (b) for the termination of a CEA, even though the practical effect of a CEA termination may mean the officer formerly in the assignment will earn less money and will no longer be in a top-level administrative position.  There is no similar express exception to the CEA statutes for peace officers, and POBRA does not include provisions for a CEA termination.  We would have to read an exception into section 19889.2 for peace officers who qualify for protection under POBRA.  We decline to make such an exception when the Legislature has not, and when section 19889.2's express exception to punitive actions harmonizes and gives effect to each statute.  Were we to read an exception into the CEA statutes for peace officers, it might well result in an institutional reluctance to use peace officers in CEA positions, which would be an undesirable and unreasonable result.  The policy of the courts of this state is to avoid statutory constructions that would lead to "unreasonable, impractical, or arbitrary results."  (*Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 290.)

Manavian also argues that section 19889.2 acts as a " 'blanket waiver' " of POBRA in violation of the holding in *County of Riverside v. Superior Court* (2002) 27 Cal.4th 793, 804 (*County of Riverside*).  There, the court stated:  "[W]e think the [POBRA] is, like many other statutory schemes enacted for the protection of a class of employees, not subject to blanket waiver."  (*County of Riverside,* at p. 804.)  The underlying circumstances in *County of Riverside* were that the officer waived in writing any right to continued employment upon the completion of an unsatisfactory background investigation report or to view the report.  (*Id*. at pp. 796-797.)  The court concluded that POBRA was established for a public purpose, thus Civil Code section 3513, which states: "Any one may waive the advantage of a law intended solely for his benefit[,] [b]ut a law established for a public reason cannot be contravened by a private agreement[,]" was controlling and prohibited waiver by the officer.

This case involves no waiver.  A waiver is "the 'intentional relinquishment or abandonment of a known right.' "  (*Cowan v. Superior Court* (1996) 14 Cal.4th 367, 371.)  Manavian has intentionally relinquished none of his rights.  Rather, this matter is resolved solely on the construction and application of two separate statutory schemes. *County of Riverside* is simply inapplicable.

Manavian also argues that he did not waive his POBRA rights merely because he was an at-will employee, citing *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 825.  He argues his CEA appointment was "not unlike" Jaramillo's job as assistant sheriff.  *Jaramillo* concluded that Jaramillo's firing violated POBRA, stating:  "To make a high-ranking peace officer an at-will employee is, in effect and as happened here, to strip that officer of the rights to notice of discipline and an administrative hearing that are central to POBRA."  (*Jaramillo,* at p. 825.)  Manavian's argument misses the mark.  A CEA is not at all equivalent to an assistant sheriff.  POBRA contains specific protections

14

for persons who are in the position of chief of police. (§ 3304, subd. (c).)[3] Furthermore, *Jaramillo* recognized that POBRA applies to police chiefs and assistant sheriffs. (*Jaramillo,* at pp. 824-825.) POBRA does not contain specific provisions applicable to CEA positions. We can assume from this fact that the Legislature did not intend CEA's to be subject to POBRA. In any event, a CEA is not at all like an assistant sheriff. A CEA is a state-wide high-level policymaking position. An assistant sheriff is a local position that is not involved in setting policy for the state.

We conclude that a CEA termination does not constitute a punitive action for purposes of POBRA. Termination of Manavian's CEA position did not trigger any POBRA rights, including any right to inspect his personnel file.[4]

---

[3] Section 3304, subdivision (c) states:

"No chief of police may be removed by a public agency, or appointing authority, without providing the chief of police with written notice and the reason or reasons therefor and an opportunity for administrative appeal.

"For purposes of this subdivision, the removal of a chief of police by a public agency or appointing authority, for the purpose of implementing the goals or policies, or both, of the public agency or appointing authority, for reasons including, but not limited to, incompatibility of management styles or as a result of a change in administration, shall be sufficient to constitute 'reason or reasons.'

"Nothing in this subdivision shall be construed to create a property interest, where one does not exist by rule or law, in the job of Chief of Police."

[4] Manavian also argues DOJ violated POBRA prior to his CEA position. This claim is time-barred. His declaration asserts the underlying facts. He claims he filed a formal complaint in May 2004 with DOJ's Equal Employment Rights and Resolution Office (Office), alleging discrimination and retaliation by DOJ personnel. The Office hired Adrian Randolph to conduct an investigation of Manavian's complaint. Manavian learned that Spike Helmick, Commissioner of the California Highway Patrol accused Manavian of being insubordinate and George Vinson of the state Office of Homeland Security accused Manavian of being dishonest. Manavian was advised that Randolph's report found no evidence of discrimination or retaliation as Manavian had alleged. Manavian attempted to obtain a copy of the report, but his request was denied. Manavian

15

II

Manavian Was Not a Whistleblower

Manavian asserts two whistleblower causes of action based on two separate statutory schemes. Labor Code section 1102.5, subdivision (b) prohibits an employer from retaliating against an employee for disclosing a violation of law to a government agency or a law enforcement agency.[5] The California Whistleblower Protection Act (§ 8547 et seq.) "prohibits retaliation against state employees who 'report waste, fraud, abuse of authority, violation of law, or threat to public health' (§ 8547.1). The Act authorizes 'an action for damages' to redress acts of retaliation." (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 882.) As is explained below, Manavian asserted he was retaliated against for reporting a violation of a federal regulation.

An action asserting that an employee was terminated for an improper reason requires that (1) the plaintiff establish a prima facie case of retaliation, (2) the defendant provide a legitimate, nonretaliatory explanation for its acts, and (3) the plaintiff show this

argues the denial of his request to view the report violated section 3306.5 of POBRA. Manavian filed his tort claim on June 15, 2006. His request to review the report was denied on December 1, 2004. Section 911.2, subdivision (a) provides that a claim must be presented within one year from the accrual of the cause of action. Manavian's June 15, 2006 claim was filed more than one year from the accrual of the cause of action when his request was denied on December 1, 2004.

[5] Labor Code section 1102.5, subdivision (b) provides: "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

explanation is merely a pretext for the retaliation. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476; *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68-69; *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453.) As is relevant here, to establish a prima facie case of retaliation under Labor Code section 1102.5, Manavian was required to show that he engaged in protected activity (here, disclosing a violation or noncompliance of a federal regulation), that he was subjected to adverse employment action by his employer, and that there was a causal link between the disclosure and the adverse action. (*Morgan v. Regents of University of California*, at p. 69.) Under section 8547 et seq. Manavian was likewise required to show that he reported a violation of law, that he was subjected to reprisals or other disciplinary action, and that there was a causal link between the disciplinary action and the protected reporting. (§§ 8547.1, 8547.3.)

We conclude Manavian has failed to establish a prima facie case because he did not disclose or report a violation of law as is required to establish a whistleblower cause of action. Therefore, we need not consider whether DOJ provided a legitimate, nonretaliatory explanation for its acts, or whether Manavian showed this explanation was merely a pretext for the retaliation.

The three actions upon which Manavian bases his whistleblower claims arise from the following facts.

First, Manavian, acting in his official capacity as Bureau chief and as a representative of DOJ, was a member of the executive board of JRIES. This system was a joint intelligence sharing project involving DOJ and federal, state, and local law enforcement entities whose purpose was to improve information sharing to help prevent terrorist attacks. Manavian wrote a letter as chairman of the executive board to General Matthew Broderick of the Operations Center telling him that the executive board was discontinuing its relationship with the Department of Homeland Security because the

17

Department of Homeland Security had "hi-jacked" JRIES. This letter was the first alleged whistleblower act.

The letter to General Broderick stated in pertinent part: "On Tuesday May 3, 2005, the state and local members of the Joint Regional Information Exchange System Executive Board had a conference call to discuss the current status and relationship between the Board and the Homeland Security Operations Center (HSOC). As you know your position as the Director of the HSOC was designated to represent the Department of Homeland Security's (DHS) interests on this Board. . . . [¶] It is unfortunate, that on the eve of the third anniversary of the creation of JRIES . . . we must inform you that the Board unanimously voted to discontinue our relationship with the HSOC. This difficult, but necessary, decision was made due to the direction that the HSOC has taken with the JRIES/[Homeland Security Information Network (HSIN)] system without any regard to the input and guidance provided by this Board. The consensus of the Board is that the HSOC has 'hi-jacked' the system and federalized a successful, cooperative federal, state, and local project. The failures that the HSOC has experienced with the JRIES/HSIN rollout are a direct result of ignoring the concerns expressed by this Board on numerous occasions. [¶] . . . [¶] On behalf of the Board, I have been asked to inform you that we will continue to operate as the JRIES Executive Board to promote our JRIES concept. Our concept, from the very inception, was not based on technology, but on process. This process took into consideration all applicable laws, privacy issues, and rules of intelligence. It was also a process built on trust."

This letter was not a protected whistleblowing activity. It did not disclose any violation of state or federal law or regulation, nor did it "report waste, fraud, abuse of authority, violation of law, or threat to public health." (§ 8547.1.) Instead it merely informs a government official that the members of the executive board of JRIES have a difference of opinion regarding the process of the system, and for that reason will no longer continue to cooperate with the Operations Center. This is not a disclosure of

18

anything and is not the type of communication protected by the whistleblower statutes. It is merely a policy dispute.

Second, the Office of Homeland Security was the government entity acting on behalf of the Governor's office to work with DOJ to further the Governor and Attorney General's agreement to support the Anti-Terrorism Center, as well as other anti-terrorism intelligence programs. DOJ, the Office of Homeland Security, and the California Highway Patrol entered into negotiations for the formation and operation of the California State Warning Center, which was intended to be a joint anti-terrorism intelligence program. An MOU was drafted, but DOJ had legal concerns over some of the terms of the MOU, and these concerns were shared by Manavian. Their concern was about what information could be shared with the Office of Homeland Security under federal and state laws. Specifically, 28 Code of Federal Regulations part 23.20(f)(1) provides that criminal intelligence information may be disseminated only to law enforcement authorities who agree to follow certain procedures. The Office of Homeland Security was not a law enforcement agency. The MOU was never implemented, and no information was ever shared under its terms because of the legal concerns over sharing information. Manavian raised in an e-mail to the chief deputy on the legal side of DOJ and in other e-mails to people within DOJ that some terms of the MOU were illegal. This is the second act that Manavian claims as whistleblower activity. The Attorney General's office reviewed the MOU in light of Manavian's questions and recommended that the MOU not be honored. Thus, Manavian's concerns were considered and accepted.

Finally, in September 2005 Manavian met with the Office of Homeland Security where someone from that office suggested illegal forms of collection of intelligence information, including wiretapping Muslim religious leaders, creating a database of prisoners who attended Muslim services, and creating a database of Iranians that lived in California. In discussions with the Office of Homeland Security representative, Manavian told the representative that such measures would violate 28 Code of Federal

19

Regulations part 23. Oules found out about the illegal intelligence gathering proposals because he asked Manavian in an e-mail how his meeting had gone. Manavian's e-mailed response was: "Still in the organizational stage. . . . [W]e could have some privacy as well as religious discrimination issues with some of the proposals that were thrown out." Oules responded: "I'm very pleased that the group deep sixed the discriminatory issues, we certainly do not want to participate in anything that would [or] might lead in that direction." This is the third alleged instance of whistleblowing activity.

Neither of these communications is a protected whistleblower communication.

California courts look to federal cases interpreting the federal Whistleblower Protection Act (WPA) of 1989 to guide out interpretation of the California whistleblower statutes. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 848-849.) "The WPA prohibits agencies from taking an adverse personnel action against an employee in retaliation for 'any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences . . . a violation of any law, rule, or regulation.' 5 U.S.C. § 2302(b)(8)(A)." (*Kahn v. Dept. of Justice* (Fed.Cir. 2010) 618 F.3d 1306, 1311.) This statutory definition covers an employee communication "(1) that discloses unknown information, (2) that an employee would reasonably believe is unlawful, and (3) that is outside the scope of the employee's normal duties or communicated outside of normal channels." (*Id.* at p. 1312.) An employee's communications can fall into three categories: "(a) disclosures made as part of normal duties through normal channels, (b) disclosures made as part of normal duties outside of normal channels, and (c) disclosures made outside of normal or assigned duties." (*Id.* at p. 1313.) Only the latter two categories qualify as protected disclosures. (*Ibid.*)

Manavian's communications did not qualify as protected disclosures because the communications were part of his normal duties through normal channels. The duties of the Bureau chief position held by Manavian, were to work "[u]nder the direction of the Director/Deputy Director, Division of Law Enforcement." His duties included ensuring

20

"compliance with all legal mandates and Departmental rules and regulations; enforce[ing] policy and procedures; and integrat[ing] the [B]ureau with other departmental and divisional programs." Part of his duties were to "develop policy for the [Bureau] and the Division of Law Enforcement related to collection and dissemination of intelligence information to other law enforcement agencies[, and] [c]ommunicate new or modified policies to the [B]ureau staff, Director/Deputy Director, [Division of Law Enforcement], Attorney General, and to local, state and federal law enforcement representatives." It was also his duty to "[r]epresent the Attorney General and/or the Director/Deputy Director, [Division of Law Enforcement] in meetings with high level state and federal enforcement officials, department heads, Governor's Office and legislators." It was his duty to "[m]aintain continuous liaison with local, state and federal law enforcement agencies to ensure active cooperation and intelligence information sharing by participating on various state-wide task forces, committee, meetings and by attending conferences." The Bureau chief was required to "develop cooperative working relationships with representatives of all levels of government, the public, and the Legislative and Executive Branches; analyze complex problems and recommend effective courses of action . . . ."

Manavian's act of contacting the "Chief Deputy on the legal side for DOJ" and Patrick Lunney, who was the Division director and to whom Manavian reported, was part of Manavian's normal duties to ensure "compliance with all legal mandates" and to communicate new policies to the director of the Division and the Attorney General. Manavian's act of reporting to Oules that he believed someone from the Office of Homeland Security was proposing discriminatory intelligence gathering was likewise part of his normal duties through normal channels.

In both instances Manavian was acting as the Bureau chief in discussions with other high-level government policymakers. Those discussions related to the procedures for collecting and sharing intelligence information following the September 11 terrorist attacks. Manavian's discussion of those procedures and his reporting to his superiors and

21

the legal experts at DOJ his concerns regarding the legality of the proposals were not protected disclosures.  Not every " 'thought, suggestion, or discussion of an action that someone might consider to be a violation of a law, rule, or regulation is a justification for a whistleblower complaint.  *Discussion among employees and supervisors concerning various possible courses of action is healthy and normal in any organization.  It may in fact avoid a violation.*' "  (*Mize-Kurzman v. Marin Community College Dist.*, *supra*, 202 Cal.App.4th at pp. 859-860, quoting *Reid v. Merit Systems Protection Bd.* (Fed.Cir. 2007) 508 F.3d 674, 678.)  Manavian's discussions of his concerns were within his job duties as an upper-level administrator and were not protected disclosures.

DISPOSITION

The judgment is affirmed.  Respondent shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/s/

Blease, Acting P. J.

We concur:


/s/

Murray, J.


/s/

Duarte, J.

22