Filed 5/20/19; Certified for Publication 6/10/19 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER ROSS, | D075106 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. PSC1403729) |
| COUNTY OF RIVERSIDE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Riverside County, David Chapman, Judge. Reversed and remanded for further proceedings.

Gusdorff Law, Janet Gusdorff; Sottile Baltaxe, Timothy B. Sottile, Michael F. Baltaxe, Jeremy D. Scherwin, and Payam I. Aframian for Plaintiff and Appellant.

Woodruff, Spradlin & Smart, Daniel K. Spradlin and Cynthia W. Kole for Defendant and Respondent.

I

INTRODUCTION

Christopher Ross appeals from a summary judgment granted in favor of the County of Riverside on Ross's claims for violation of Labor Code section 1102.5 and for

violation of the provisions in the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; FEHA) prohibiting disability discrimination, failure to reasonably accommodate, failure to engage in the interactive process, and failure to prevent disability discrimination.[1] Because we conclude there are triable issues of material fact of the questions of whether Ross engaged in protected activity under Labor Code section 1102.5 and whether Ross had a physical disability under the FEHA, we reverse the judgment as to these claims and remand the matter for further proceedings consistent with this decision.

---

[1] Ross also had claims for disability harassment and disability retaliation. Ross abandoned his disability harassment claim. In addition, for the first time on appeal, the County asserted it is entitled to summary judgment on Ross's disability retaliation claim because the claim as alleged by Ross did not exist under the FEHA in 2013. Ross does not dispute the point. (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 244–248.)

II

BACKGROUND[2]

A

Ross worked for the County as a deputy district attorney. He was assigned to the homicide prosecution unit and was "responsible for however many cases were assigned to [him] by [his] supervisor." In addition to trying the cases, his duties included filing complaints and informations; conducting preliminary hearings; appearing at trial readiness conferences, settlement conferences, and motion hearings; and preparing for trial, including turning over discovery, interviewing witnesses, and conducting further investigation. Among the cases assigned to him were death penalty cases, which were considered the most difficult cases in the office.

In July or August 2011, an assistant district attorney assigned him a case initially handled by another attorney. The attorney told the assistant district attorney she believed the defendant was innocent. Although the defendant had admitted committing the crime, the attorney believed the defendant's confession was coerced.

---

[2] As required when a case is on appeal from the grant of a defendant's motion for summary judgment, we recite the evidence in the light most favorable to the plaintiff. (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 703.) Below the County submitted 113 objections to Ross's evidence, which the trial court overruled without substantive comment. The County requests we sustain the objections and exclude the challenged evidence on appeal. However, we decline to review the propriety of the court's ruling on the objections because the County did not file a cross-appeal and has not asserted review of the court's ruling is necessary to determine whether any trial court error prejudiced Ross. (See Code Civ. Proc., § 906; *Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744, 758, fn. 9.)

In late November 2011, the attorney provided Ross with a memorandum in which she recommended dismissing the case because the defendant was innocent. She previously recommended dismissing the case more than year earlier during a meeting about the case because she believed the case lacked inculpatory evidence. However, the district attorney and assistant district attorney took no action at the time.

In December 2011, Ross e-mailed his supervisor and the assistant district attorney about the case. He informed them he did not believe the district attorney's office could prove the case beyond a reasonable doubt. He recommended conducting further DNA testing.

Two days later, Ross sent additional evidence out for DNA testing. The same day he e-mailed his supervisor and the assistant district attorney and again informed them he did not believe the district attorney's office could prove the case beyond a reasonable doubt. He recommended dismissing the case.

Ross believed the district attorney's office was violating the defendant's due process rights by engaging in a malicious prosecution case against the defendant; however, he never expressly informed his supervisor or the assistant district attorney he believed the district attorney's office was violating state or federal law.

About five months later, in May 2012, Ross received the results from the DNA testing. The results exculpated the defendant and Ross turned the results over to defense counsel. Based on the DNA test results, Ross believed there was no longer probable cause to file a case against the defendant.

4

A year later, in May 2013, Ross received "corrected" results from the DNA testing. The results exculpated the defendant with further certainty and Ross turned the results over to defense counsel.

Ross informed his supervisor and the assistant district attorney about the DNA results and again recommended dismissing the case. The assistant district attorney told him not to turn the results over to the defense and appeared upset when Ross indicated he had already disclosed the results to defense counsel.

In late September 2013, Ross learned of a new witness in the case. In early October 2013, an investigator interviewed the witness. The witness informed the investigator the defendant was innocent and implicated the defendant's roommate instead.

Ross had the investigator interview another witness and obtained recordings of phone calls the roommate made while in jail. In late October 2013, the investigator located recordings of two phone calls in which the roommate admitted to murdering the victim. By then, Ross had been transferred to the Filing Unit (see part II.B., *post*). He had the investigator send the information to the assistant district attorney.

A few days later the assistant district attorney, the chief deputy district attorney, and Ross's supervisor met with the investigator to discuss the case, particularly the exculpatory effect of the most recently obtained evidence. During the meeting, the assistant district attorney told the investigator not to turn the phone call evidence over to the defense attorney.

After the meeting, the assistant district attorney contacted Ross and asked whether Ross had turned the phone call evidence over to the defense attorney. Ross asked if the

assistant district attorney wanted him to turn the evidence over. The assistant district attorney stated he would take care of it and handle the case. The district attorney's office dismissed the case against the defendant in February 2014.

B

In May 2013, the same month Ross received the "corrected" DNA test results, Ross learned he was exhibiting neurological symptoms that required evaluation and testing to determine whether he had a serious neurological condition. The same month or the next month, he told his supervisor he might be very seriously ill with a neurodegenerative disease and needed to undergo medical testing. He requested a transfer to another assignment during the testing. His supervisor declined his request, telling him the district attorney's office would worry about his cases and transferring him if and when he found out he could not continue in his position.

Ross also asked not to be assigned any new cases until after he completed the medical testing. His supervisor declined this request without explanation. Ross then arranged with opposing counsel to continue the work on his cases for several months until he had completed his medical testing.

Sometime a week or two later, the chief deputy district attorney called and asked Ross if he wanted to be transferred to the Filing Unit or to receive another accommodation. Ross declined the offer because he had already continued the work on his cases and no longer needed a transfer. In addition, he believed the Filing Unit's filing quota would be too stressful for him to meet because of his doctors' appointments.

However, to avoid stress, he asked not to receive any new cases. The chief deputy district attorney agreed to the request.

In mid-September 2013, Ross told his supervisor multiple doctors from the out-of-state clinic where he was undergoing testing told him he could not have any stress from work as it was causing many of his symptoms and medical problems. He also told her he needed further testing because, although the doctors had ruled out two neurological diseases, they thought he might have an as yet undiagnosable autoimmune disorder as well as brain damage from multiple concussions.

The next day, Ross's supervisor assigned him a new death penalty case to work on. He told her he could not work on the case because he had further medical testing through October 2013. She told him to start work on the case and she would take it over if he could not complete it. He complained to the chief deputy district attorney about the new assignment because he believed they had an agreement he would not receive any new case assignments while he was undergoing testing. He reiterated his medical need for stress aversion and asked to speak with the chief deputy district attorney in person about the matter. When they spoke, the chief deputy district attorney assured Ross the case would be reassigned back to Ross's supervisor until Ross was finished with his medical testing. However, the reassignment never occurred.

In late September 2013, Ross met with his supervisor, the chief deputy district attorney, and the assistant district attorney to discuss transferring him from the Homicide Unit to the Filing Unit for the next three months because he was not able to go to trial or accept new cases. In the assistant district attorney's view, Ross's inability to accept new

cases or go to trial in the near term made him insufficiently productive to be a member of the Homicide Unit.

Ross informed the trio he had a concussion syndrome from his work during his military service and his doctors were testing him for any possible neurological issues the syndrome may be causing. He also informed them his doctors suspected he has an unmanifested autoimmune disorder and they advised him to reduce his stress levels.

Ross followed up the meeting with the letter asking the trio to be patient until the end of November 2013 when his medical testing would be completed. He stated he did not have any cases going to trial within the next 60 days and would be able to appear in court on his cases and prepare them for trial while still being able to travel out-of-state as needed for medical appointments. He also stated being reassigned to the Filing Unit would be too stressful since he did not believe "based upon [his] current medical conditions and the limitations proscribed by [his] treating physicians" he would be able to meet the filing quotas. In addition, he felt the reassignment would be "far too strenuous and stressful" because he was expected to continue assisting with his homicide cases. He stated his current medical condition only allowed him to handle a single assignment. He explained the reasons he believed the rationale for the reassignment was faulty. He then stated it was his position "that it would be best for the Homicide Unit and [his] health to keep [him] in [his] current position of assignment and not assign [him] any new cases until December [2013], when [they] will know [his] health concerns." He testified in deposition that, although his position in the Homicide Unit would usually be more stressful than a position in the Filing Unit, it was not in this instance because he had

8

arranged for three-month continuances of the motion hearings, preliminary hearings, and trials on his cases.

A few days later, at the end of September 2013, Ross completed a form querying his assignment preferences for the upcoming 2013 rotations. On the form, he stated he wanted to move to "something with no stress, no quotas, no deadlines, no pressure."

About two weeks later, in mid-October 2013, the assistant district attorney sent Ross a memorandum recounting Ross's statements indicating his need for stress aversion, including Ross's statements on the assignment preferences form. The memorandum directing Ross "to provide a physician's written documentation that indicates whether or not you have restrictions or limitations on your duties. Once you have provided such documentation we will be better able to determine how to move forward. If there are limitations and/or restrictions we will work with County Human Resources to engage in the return to work process and an interactive process, to ensure we are making reasonable accommodation under [the Americans with Disabilities Act (42 U.S.C. § 12101 et seq; ADA) and the] FEHA."

Around this same time, the assistant district attorney offered Ross an opportunity to take leave of absence under the Family and Medical Leave Act of 1993 (29 U.S.C. § 2601 et seq.; FMLA), which Ross declined. The district attorney's office subsequently rotated him from the Homicide Unit to the Filing Unit.

By the end of October 2013, Ross had not supplied the requested physician's documentation. The assistant district attorney sent him an e-mail directing him to submit the documentation on or before the close of business two business days later. Ross told

9

the assistant district attorney he was unable to obtain the documentation from the physicians evaluating him at the out-of-state clinic because they had a practice of not supplying such documentation; however, he twice offered to obtain a note from his primary care physician stating he was medically fit to work. The assistant district attorney declined the offer and insisted the documentation had to come from the out-of-state clinic.

Ross never provided the County with any documentation from a health care provider regarding any restrictions or limitations on his ability to perform his duties. In addition, he testified in his deposition that none of the physicians at the out-of-state clinic suggested any restrictions on his activity at work or outside of work. Rather, they advised him to reduce his stress load at work and in his life in general. Specifically, they advised to have his work do whatever was necessary to reduce his stress.

From June 2013 to November 2013, Ross missed about three weeks of work to attend out-of-state medical appointments. In mid-November 2013, the County placed him on a paid administrative leave of absence pending the outcome of a fitness-for-duty examination. The County scheduled an appointment with a neurologist in Orange County. The appointment was to occur in early January 2014. However, Ross requested the appointment be moved to Los Angeles. Meanwhile, the County requested Ross sign a medical records release. Without the medical records release, the County was unable to secure an appointment with a neurologist in Los Angeles.

Around the same time, in January 2014, Ross decided he no longer wanted to work for the district attorney's office. In February 2014, Ross served the County with a

government claim, which the County denied.  In March 2014, he filed a federal lawsuit against the County, which he later dismissed.

In mid-April 2014, the County wrote Ross explaining that for the County to engage in a good faith interactive process and to evaluate his request for accommodation the County needed medical documentation from an appropriate healthcare professional or from the Board-certified specialist selected to perform the fitness for duty examination. The County provided Ross with three options for accomplishing these objectives.  The first option was to "provide ... a listing of functional limitations (not a diagnosis) from an appropriate healthcare professional ... and we will contact our HR Service Team to begin the ADA/FEHA interactive accommodation process."  The second option was to "sign the medical release(s) requested by Occupational Health and the fitness for duty examination will proceed.  Upon receipt of the outcome of the fitness for duty examination, the ADA/FEHA interactive accommodation process will be initiated if functional limitations are imposed."  The last option was to "return to work [on a specified date two weeks from the date of the letter], without accommodation and perform the full scope of your job duties ... .  Without medical documentation supporting the need for a work accommodation, the County is entitled to require you perform all of the essential functions of your job without accommodation."  The next day, a County human resources services manager sent Ross a letter inviting him to participate in the interactive accommodation process.

11

A little over a week later, Ross's counsel sent the County's counsel a letter stating no reasonable person could work for the County under the conditions Ross endured. Consequently, Ross deemed himself constructively terminated as of the date of the letter.

A few days later, at the end of April 2014, the County sent Ross another letter directing him to return to work on Monday of the following week. The letter informed him he would be welcomed to work by his supervisor and there would be a meeting with the human resources service team at which time he would have "the opportunity to raise any concerns that [he] may have about returning to work, whether related to the interactive process, accommodations, FMLA leave, or any other matters related to your employment."

In mid-May 2014, the County sent Ross a letter again ordering him to return to work by a specified date. Ross sent a responsive letter indicating he had been constructively terminated and no longer worked for the County.

In early June 2014, the County sent Ross a letter directing him to contact the County by a specified date. The letter further informed him if he did not contact the County by that date, the County would consider him to have abandoned his position.

A few days later, Ross sent a responsive letter stating he had repeatedly informed the County he would not be returning to work and requesting the County pay him for any accrued vacation and sick leave. Eleven days later, in mid-June 2014, the County sent Ross a final notice of job abandonment indicating the County considered him to have abandoned his job as of June 12, 2014.

12

C

In July 2014, Ross sued the County and others for violations of Labor Code section 1102.5 and the FEHA's disability-related provisions.  The County filed a motion for summary judgment.  As related to this appeal, the County asserted Ross could not establish his claim for violation of Labor Code section 1102.5 because he cannot prove he engaged in protected activity.  He could not establish his claim for disability discrimination because he could not prove he could perform the essential functions of his job.  He could not establish his claim for failure to provide a reasonable accommodation for the same reasons as well as because he could not prove he had any functional limitations requiring accommodation and his requested accommodation was not reasonable.  He could not establish his claim for failure to engage in the interactive process because he did not interact in good faith.  And, he could not establish his claim for failure to prevent disability discrimination because he could establish his claims for disability discrimination.

The court granted the motion as to Ross's claim for violation of Labor Code section 1102.5 claims on the ground Ross could not establish he engaged in activity protected under this statute.  The court granted the motion as to Ross's claims for disability discrimination, failure to reasonably accommodate, and failure to engage in the interactive process on the ground Ross could not establish he was disabled.

13

III

DISCUSSION

"A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  A defendant may make this showing by demonstrating that the plaintiff cannot establish one or more elements of all of his or her causes of action, or that the defendant has a complete defense to each cause of action.  [Citation.]

"In reviewing a trial court's ruling on a motion for summary judgment, the reviewing court makes ' "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.  [Citations.]"  [Citation.]'  [Citation.]"  (*Nosal-Tabor v. Sharp Chula Vista Medical Center* (2015) 239 Cal.App.4th 1224, 1234.)

A

We first consider Ross's claim for violation of Labor Code section 1102.5.  Under this code section, an employer may not retaliate "against an employee for disclosing information ... to a government or law enforcement agency [or] to a person with authority over the employee ... if the employee has reasonable cause to believe that the information discloses a violation of [a] state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the

14

information is part of the employee's job duties." (Lab. Code, § 1102.5, subd. (b).)[3] "A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency." (Lab. Code, § 1102.5, subd. (d).)

A claim for violation of Labor Code section 1102.5 requires "(1) the plaintiff establish a prima facie case of retaliation, (2) the defendant provide a legitimate, nonretaliatory explanation for its acts, and (3) the plaintiff show this explanation is merely a pretext for the retaliation. [Citations.]" (*Manavian v. Department of Justice* (2018) 28 Cal.App.5th 1127, 1141.) To establish the first element, the plaintiff must show (1) the plaintiff engaged in protected activity, (2) the defendant subjected the plaintiff to an adverse employment action, and (3) there is a causal link between the two. (*Ibid.*)

Ross contends we must reverse the summary judgment as to his claim for violation of Labor Code section 1102.5 because there is a triable issue of material fact on the question of whether he engaged in activity protected by the statute. An employee engages in protected activity under the statute when the employee discloses " 'reasonably based suspicions' of illegal activity. [Citation.]" (*Green v. Ralee Engineer Co.* (1998) 19 Cal.4th 66, 87.) "To have a reasonably based suspicion of illegal activity, the employee

---

3    Our citations to Labor Code section 1102.5 are to the current version of the statute. (Stats. 2015, ch. 792, § 2, eff. Jan. 1, 2016.) Former versions of statute were in effect when the acts underlying Ross's complaint occurred. (See Stats. 2003, ch. 484, § 2, eff. Jan. 1, 2004; Stats. 2013, ch. 577, § 5, Stats. 2013, ch. 732, § 6, and Stats. 2013, ch. 781, § 4.1, eff. Jan 1, 2014.) Neither party argues we should apply a former version of the statute in this appeal.

must be able to point to some legal foundation for his suspicion—some statute, rule or regulation which may have been violated by the conduct he disclosed. [Citation.]" (*Fitzgerald v. El Dorado County* (E.D. Cal. 2015) 94 F.Supp.3d 1155, 1172.)

In this case, Ross provided evidence showing he disclosed information to his superiors indicating the district attorney's office would not be able to prove a particular murder case beyond a reasonable doubt and lacked probable cause to continue prosecuting the case because the defendant's confession was coerced, Ross discovered DNA evidence exculpating the defendant, and the defendant's roommate admitted in recorded phone calls to being the killer. Based on this information, Ross recommended dismissing the case. He based this recommendation, at least in part, on his belief continued prosecution would violate the defendant's due process rights as well as a prosecutor's ethical obligations under state law. (See Bus. & Prof. Code, § 6068, subd. (f) [An attorney has the duty to "advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he or she is charged"]; Gov. Code, § 26501 ["The district attorney shall institute proceedings before magistrates for the arrest of persons charged with or reasonably suspected of public offenses when he has information that such offenses have been committed"]; Rules Prof. Conduct, rule 3.8(a) ["The prosecutor in a criminal case shall [¶] not institute or continue to prosecute a charge that the prosecutor knows is not supported by probable cause"].)

If credited by a trier of fact, the evidence shows Ross engaged in protected activity because he disclosed information to a governmental or law enforcement agency and to people with authority over him which he reasonably believed disclosed a violation of or

16

noncompliance with federal and state law applicable to criminal prosecutions and prosecutors. Although Ross did not expressly state in his disclosures that he believed the County was violating or not complying with a specific state or federal law, Labor Code section 1102.5, subdivision (b), does not require such an express statement. It requires only that an employee disclose information and that the employee reasonably believe the information discloses unlawful activity. (Lab. Code, § 1102.5, subd. (b).)

Moreover, the particular information disclosed in this case, that evidence developed during Ross's handling of the case undermined the district attorney's office's basis for continuing to prosecute the case, should have raised the same constitutional, statutory, and ethical concerns to Ross's superiors as they did to Ross because Ross's superiors were also prosecutors subject to the same legal and ethical constraints as Ross. Accordingly, we conclude the court erred in granting the County summary judgment as to Ross's cause of action for violation of Labor Code section 1102.5 to the extent the cause of action is based on the prohibitions in subdivision (b).

Given this conclusion, we need not address whether there is a triable issue of material fact on the question of whether the County violated Labor Code section 1102.5, subdivision (c), which prohibits an employer from retaliating "against an employee for refusing to participate in an activity that would result in a violation of [a] state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." We also need not address whether there is a triable issue of material fact on the question of whether the County violated Labor Code section 1102.5, subdivision (a), by "mak[ing], adopt[ing], or enforc[ing] any rule, regulation, or policy preventing an

17

employee from disclosing information to a government or law enforcement agency [or] a person with authority over the employee ... if the employee has reasonable cause to believe that the information discloses a violation of [a] state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

B

We next consider Ross's claims for violations of the FEHA. The FEHA prohibits an employer from discharging or discriminating against an employee because of the employee's physical disability. (Gov. Code, § 12940, subd. (a).) The FEHA also prohibits an employer from failing to reasonably accommodate an employee's known physical disability, from retaliating against an employee who requested reasonable accommodation, and from failing to engage in a timely, good faith interactive process with an employee who requested reasonable accommodation. (*Id.*, subds. (m), (n).)

Ross contends we must reverse the summary judgment on his claims for violations of the FEHA because there is a triable issue of material fact on the question of whether he was physically disabled within the meaning of the FEHA. A physical disability under the FEHA includes any physical impairment that affects the neurological or immunological systems and limits a major life activity. (Gov. Code, § 12926, subd. (m)(1).) A physical disability "limits a major life activity if it makes the achievement of the major life activity difficult." (Gov. Code, § 12926, subd. (m)(1)(B)(ii); Cal. Code Regs., tit. 2, § 11065, subd. (l)(3).) " '[W]orking' is a major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad

18

range of employments." (Gov. Code, § 12926.1, subd. (c), § 12926, subd. (m)(1)(B)(iii); Cal. Code Regs., tit. 2, § 11065, subd. (l)(1)&(3)(D).) Repeated or extended absences from work for medical appointments constitute a limitation on the major life activity of working. (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 588–589.)

A physical disability may be temporary or short term (*Diaz v. Federal Express Corp.* (C.D. Cal, 2005) 373 F.Supp.2d 1034, 1043) and includes not only physical impairments that are actually disabling, but also physical impairments that are potentially disabling or are perceived as disabling or potentially disabling. (Gov. Code, § 12926.1, subd. (b) ["It is the intent of the Legislature that the definitions of physical disability and mental disability be construed so that applicants and employees are protected from discrimination due to an actual or perceived physical or mental impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling"].) A physical disability is perceived as potentially disabling when an employer regards or treats an employee as having a physical impairment that has no present disabling effect but may become a disabling in the future. (Cal. Code Regs., tit. 2, § 11065, subd. (d)(6); *American National Ins. Co. v. Fair Employment & Housing Com.* (1982) 32 Cal.3d 603, 609–610.)

In this case, Ross provided evidence he had symptoms of and was being tested at an out-of-state clinic for a potentially disabling neurological disease or autoimmune disorder. The testing occurred over several months, requiring him to periodically take time off work to travel to the clinic. To accommodate the testing, he first requested to be

19

assigned to another unit, which his supervisor denied.  He then requested not to receive any new cases to work on during the testing, which his supervisor also denied, but which a higher-level supervisor granted.  Meanwhile, he arranged with opposing counsel to continue the motions and hearings on his existing cases to enable him to complete the testing while maintaining relatively stress-free working conditions.

About midway through the testing process, his supervisor assigned him a new case.  He complained about receiving the new case because it contravened his agreement with the higher-level supervisor, it required immediate attention, there were other prosecutors available to handle it, and handling it would increase his stress level, which the physicians conducting the testing had advised him to avoid.

Around the same time, Ross completed a form querying his preferences for his assignment rotation and indicated a desire for a stress-free assignment.  In a subsequent meeting with his supervisor and two higher-level supervisors to discuss the possibility of transferring him to the Filing Unit, he indicated the transfer would be too stressful because of the Filing Unit's production quotas.  Instead, he indicated the least stressful option for him would be to remain in the Homicide Unit with his current caseload, which he had adjusted to allow for completion of his medical testing without any imminent deadlines.  But, the assistant district attorney did not want him to remain in the Homicide Unit because he believed Ross's inability to accept new cases or go to trial while undergoing testing made Ross insufficiently productive for the Homicide Unit.

When the assistant district attorney asked Ross for medical documentation of any work limitations, Ross offered to provide documentation from his primary care physician.

20

However, the assistant district attorney would only accept documentation from the out-of-state clinic conducting the testing. Ross could not produce the documentation because the clinic did not provide such documentation. Meanwhile, the assistant district attorney transferred Ross involuntarily to the Filing Unit and then placed him on a paid leave of absence pending the outcome of a fitness for duty examination.

This evidence, if believed by the trier of fact, shows Ross had a temporary or short-term physical impairment that was potentially disabling or perceived by the County as potentially disabling enough to transfer Ross from one unit to another unit; request he supply medical documentation of the impairment, but only from a doctor at the out-of-state clinic where he was undergoing testing; and place him on a paid leave of absence pending a fitness for duty examination arranged by the County. The physical impairment limited the major life activity of working because it required Ross to be absent from work periodically over several months to travel to an out-of-state clinic for medical testing. As this evidence meets Ross's burden of demonstrating there is a triable issue of material fact on the question of whether he had a physical disability under the FEHA, the court erred in granting summary judgment on Ross's claims for disability discrimination, failure to reasonably accommodate, failure to engage in the interactive process, and failure to prevent disability discrimination.

C

In the Conclusion section of his opening brief, Ross requested without authority that "this Court exercise its powers, in the interest of justice, to remand the case to a trial court within San Bernardino County because of the conflict of interest with defendant,

21

Riverside County, arising from the fact that [the assistant district attorney to whom Ross made the subject disclosures] is a sitting Riverside County Judge, and [the district attorney at the time Ross made the subject disclosures] is a former Riverside Judge." Even assuming authority existed for this request and the request had been properly preserved for review, the exclusive means of obtaining appellate court review of a determination on the question of a disqualification of a judge is through a timely petition for writ of mandate. (Code Civ. Proc., § 170.3, subd. (d); *Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063.) We, therefore, decline the request.

IV

DISPOSITION

The judgment is reversed as to Ross's claims for violation of Labor Code section 1102.5 and for violation of the FEHA's provisions prohibiting disability discrimination, failure to reasonably accommodate, failure to engage in the interactive process, and failure to prevent disability discrimination. The matter is remanded to the superior court for further proceedings consistent with this decision. Appellant is awarded his appeal costs.

McCONNELL, P. J.

WE CONCUR:

NARES, J.

O'ROURKE, J.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER ROSS, | D075106 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. PSC1403729) |
| COUNTY OF RIVERSIDE, | |
| Defendant and Respondent. | ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed May 20, 2019 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request(s) pursuant to rule 8.1120(a) for publication is/are GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties